Moulton *v.* Libbey.

## MOULTON *versus* LIBBEY.

37 472
91 352

37 472
93 536
37 472
94 112

37 472
103 330

37 472
f105 78
105 79
105 80
105 81

Of the grant from Charles 1st, to Sir Ferdinando Georges, of the Province of Maine.

Of the effect of the Colonial ordinance of 1641, upon the rights of riparian proprietors in the flats between high and low water mark.

Of the *jus publicum* and *jus privatum* in the shores, creeks and arms of the sea.

Of the claim by individuals to dig clams by *usage.*

Of the statutes of Maine regulating the taking of clams.

By the common law the people have the right of fishing in the sea, or creeks or arms thereof, as a public *common piscary*, and may not be restrained, unless in such places, creeks or navigable rivers, where either the king or some particular subject hath acquired a propriety exclusive of that common liberty.

The shores of the sea and navigable rivers, within the flux and re-flux of the tide, belong *prima facie* to the king, and may belong to a subject.

But the *jus privatum* of the owner, or proprietor, is charged with, and subject to the *jus publicum*, which belongs to the king's subjects.

Whatever right the king had by royal prerogative in the shores of the sea or navigable rivers, he held as a *jus publicum*, in trust for the benefit of the people, for the purpose of *navigation* and of *fishery.*

The grant from Charles 1st, to Ferdinando Georges of the Province of Maine, without the proviso, would not necessarily be construed as impairing the *common* right of piscary.

But if any doubt might arise as to the legal construction of this grant, in its effect upon the *common* right of fisheries, without the proviso or saving clause, there can be none when that is considered as a part of that instrument. The *common right* of fishing in the sea and creeks of the Province is expressly saved by the proviso or saving clause.

Nor is that saving clause *restricted* to the taking of such fish as may be and usually are dried upon the shore. The words "and drying of their fish and drying of their nets ashore," confer an *additional right* to what his subjects had by the *common law.*

Although by the colonial ordinance of 1641, the riparian proprietor acquired a title to the flats adjoining, not exceeding one hundred rods between high and low water mark, yet, he can acquire no *exclusive* right to the fisheries upon them, by such ownership.

The common right of *fishing* is in subordination to the right of *navigation*, and any wharves or buildings upon flats consistent with the latter, will be allowed by the former.

The general term "piscaria" includes all fisheries without any regard to their distinctive character, or to the method of taking the fish.

Shell fisheries, including the digging of clams, are embraced in the *common* right of the people to fish in the sea, creeks and arms thereof.

Moulton *v.* Libbey.

○

One accustomed to dig clams for sixty years in certain flats subject to the flux and reflux of the tide, cannot set up such acts as evidence of an *exclusive right* within such limits.

The State, as representing the people, have the right to regulate the common rights and privileges of fishing.

The R. S., c. 61, is such a regulation, and is designed for the protection and furtherance of the enjoyment of the *common* right, and is therefore valid.

ON REPORT from *Nisi Prius,* WELLS, J., presiding.

DEBT, to recover the penalty prescribed in § 4, of R. S., c. 61.

"If any person shall take or otherwise wilfully destroy any oysters or other shell-fish, or obstruct their growth in their beds, in any of the waters of this State, except as provided in the two following sections, he shall forfeit to the person suing therefor, not less than one dollar, nor more than two dollars, for each bushel thereof including the shell-fish so taken or destroyed."

Section 5, enacts that "the selectmen of the town, or assessors of the plantation, wherein such oysters or other shell-fish may be found, may, in writing, authorize any persons to take the same at such times and in such quantities, and for such uses, as they shall think proper, and shall express in their permits; and any inhabitants of such town or plantation, or native Indian within this State, may take the same without any permit, for the consumption of himself or family; provided, that no person, without such permit, shall be allowed to take oysters, for any purpose, in the months of June, July or August."

Section 6. "Any fisherman may, without such permit, take any shell-fish suitable for bait necessary for his use, and in a quantity, not exceeding seven bushels, including the shells, at any one time."

The defendant pleaded the general issue, and filed a brief statement, setting up title derived from the grant of Charles I., King of England; and also justified the taking, on the ground that he and those under whom he claimed, had been accustomed there to take clams for a period of sixty years-

The taking of the clams, viz: twenty-five bushels, from

their beds where they had been accustomed to grow and be from time immemorial, on the flats, and between high and low water mark, but not more than one hundred rods from high water mark, was admitted; and further, that they were not taken for any purpose authorized by the statute above cited; and that it was without the authority or permit of the selectmen of Scarborough.

The defendant introduced a copy of the record of an instrument entitled on the record "a Charter of the Province of Maine," from Charles I., King of England, &c., to Sir Ferdinando Georges; and a copy of an instrument from said Georges to Thomas Cammack, conveying the premises, all which were recorded in York county, in 1640.

It was admitted that the premises described in the writ were embraced in the instrument to Cammack, the defendant setting up the title which Cammack had.

The grant to Georges, his heirs and assigns, was by metes and bounds, from the entrance of Piscataqua harbor, northeastward one hundred and twenty miles, and all the islands and flats lying within five leagues of the main, along the coast, "with all and singular, the soils and grounds thereof, as well dry as covered with water, and all waters, ports, havens and creeks of the sea; together with the fishing of what kinds soever, as well pearls as fish, as whales, sturgeons, or any other either in the sea or rivers, * * * * saving always to all our subjects of our kingdom of England, liberty of fishing as well in the sea as in the creeks of the same Province and premises aforesaid, and drying of their fish, and drying of their netts ashore of the said Province and any of the premises."

The case was thereupon withdrawn from the jury, and it was agreed that if the full Court shall be of opinion, that the facts set up in defence would not establish one, then the defendant is to be defaulted for $25, as damages, and legal costs. But if the facts stated would constitute a defence, then the case is to be submitted to a jury to determine the matters set forth in the brief statement.

*Clifford* and *E. L. Cummings*, in the opening argument for plaintiff, assumed the following positions, to support which they cited numerous authorities, a large part of which are necessarily omitted.

1. The right of the plaintiff to recover is admitted, unless the matters set up in justification constitute a defence. R. S., c. 61, § § 4, 5, 6.

2. It is well established by repeated decisions, that clams are shell-fish, and therefore are embraced within the prohibitions of the 4th section of this Act. *Parker* v. *Cutler Mill-Dam Co.*, 20 Maine, 353; 2 Dane's Abr. c. 68, art. 2, § 14, p. 693; *Bagot* v. *Orr*, 2 Bos. & Pul. 472; *Martin* v. *Waddell*, 16 Pet. 367; *Weston* v. *Sampson*, 8 Cushing.

3. It ever has been, and still is the established doctrine of the common law, that the liberty of fishing in the sea, or in the creeks and arms thereof, belongs as of common right, to the people of England, as a public common of piscary, and of this right they cannot lawfully be deprived, even by the grant of the king. *Mayor of Oxford* v. *Richardson*, 4 Term R. 437; *Bagot* v. *Orr*, 2 Bos. & Pul. 472; 2 Greenl. Cruise, p. 57 to 59, title 27, Franchise; 3 Kent's Com., 4th ed. p. 417; *Parker* v. *Cutler Mill-Dam Co.*, 20 Maine, 353.

4. It is clearly settled that the people of England cannot be deprived of that right by any grant of the king since Magna Carta. *Warren* v. *Matthews*, 1 Salk. 347; *Same case*, 6 Mod. 73; 16 Vin. Abr. title "Piscary," p. 354; 2 Blk. Com. pp. 39 and 417; *Att'y Gen.* v. *Burridge*, 10 Price, 350; *Blundell* v. *Cateroll*, 5 Barn. & Ald. 268; *Duke of Somerset* v. *Fogwell*, 5 Barn. & Cres. 875, (12 C. L. 395;) *Martin* v. *Waddell*, 16 Pet. 367; 2 Greenl. Cruise, p. 56, note 2; *Weston* v. *Sampson*, 8 Cush.

5. The charter from the king to Sir Ferdinando Georges, is not a deed conveying private property, to be interpreted by the rules applicable to cases of that description. It was an instrument upon which were to be founded the institutions of a great political community, and in that light it

should be regarded and construed. *Martin* v. *Waddell,* 16 Pet. on page 411.

6. The object of this charter appears on its face. It was made for the purpose of enabling the said Georges to establish a colony upon this part of our continent, to be governed, as nearly as circumstances would permit, according to the laws and usages of England; and in which said Georges, his heirs and assigns, were to stand in the place of the king, and administer the government according to the principles of the British constitution. And the people who were to plant the colony, and form the political body over which he was to rule, subject to the crown of England, were to enjoy and possess all the rights and privileges appertaining to the people of the mother country. *Martin* v. *Waddell,* 16 Pet. on page 412.

7. The territory granted by King Charles to Georges was held by the king, not as private property, but in his public and regal character, as the representative of the nation, and in trust for the nation, and Georges only held in the same character, in lieu of and in place of the king, as the political trustee of the people of the colony. *Johnson* v. *McIntosh,* 8 Wheaton, 595; *Martin* v. *Waddell,* 16 Pet. on page 412.

8. The charter of Georges never had any validity; and if it had, it became void long prior to the revolution, by the permanent establishment over the territory in question, of the authority and jurisdiction of Massachusetts. The controversy which preceded that event, was a political rather than a legal one, and was ultimately terminated in favor of Massachusetts. In this decision all parties concerned, both king and people, ever after acquiesced. Such being the facts, the rule of law is, that the judiciary follows the final determination of the question by the political department of the government. *Foster & al.* v. *Nielson,* 2 Pet. 253; *Pollard's heirs* v. *Kibbee,* 14 Pet. 353; *Pollard's lessee* v. *Files,* 2 How. 592.

9. When the revolution took place, the people of each

State became themselves sovereign, and in that character held the absolute right to all their navigable waters and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government. *Pollard* v. *Hagan*, 3 How. 212; *Carson* v. *Blazer & als.* 2 Binney, 475.

10. The doctrine of the common law in regard to the soil between high and low water mark, was changed by the ordinance of 1641. *Gerrish* v. *Proprietors of Union Wharf*, 26 Maine, 384; Ancient Charters, p. 148; *Moore* v. *Griffin*, 22 Maine, 350.

11. No change was made as to the rights of fishing or of navigation, but, on the contrary, these were in express terms ratified and confirmed to be of common right. *Weston* v. *Sampson*, 8 Cush.; *Drake* v. *Curtis*, 1 Cush. 413.

12. It being established that the right of fishing is a public right, common to all the citizens of the State, it follows, as a necessary consequence, that the regulation of the right is vested in the Legislature. *Peables* v. *Hannaford*, 20 Maine, 106; *Commonwealth* v. *Chapin*, 5 Pick. 199; *Nickerson* v. *Brackett*, 10 Mass. 212; *Cottrill & al.* v. *Myrick*, 12 Maine, 222; 3 Kent's Com. (4th ed.) 413; Angell on Tide Waters, 152, 153; *Commonwealth* v. *Alger*, 7 Cush. 53, 81 and 82; *Weston* v. *Sampson* 8 Cush.

13. The justification set up by the defendant is insufficient to constitute a defence.

I. It is not a prescription. 2 Greenl. Cruise, title 31, p. 218; 2 Greenl. Cruise, title 27, p. 56; Angell on Tide Waters, pp. 25 and 26, note 3, and p. 135; *Arundel* v. *McCulloch*, 10 Mass. 70; *Melville* v. *Whiting*, 10 Pick. 295; *Perley* v. *Langley*, 7 N. H., 233; *Delaware & Maryland R. R. Co.* v. *Stump*, 8 Gill & Johns. 479.

II. It is not a custom. *Cullom* v. *Binbury*, 5 Iredell, 118; *Medford* v. *Pratt*, 4 Pick. 222; *Fitzwalter's case*, 1 Mod. 105; Holt, 323; *Ward* v. *Cresswell*, Willes, 268; *Grimsted* v. *Marlow*, 4 Term R. 717; *Drake* v. *Curtis*, 1 Cush. 215.

14. No one can prescribe against a statute, nor can a custom be supported against an Act of the Legislature. *Griflin* v. *Wood*, Cro. Eliz. 85; *King* v. *Major*, 4 Term R. 670; *Master of St. Cross Hospital* v. *Lord Howard*, 6 Term R. 38; 2 Greenl. Cruise, title 31, "Prescription," p. 223.

15. The right of taking shell-fish, except on the terms prescribed by the Legislature, has been prohibited by statute, at least since May 1, 1765. Repealed Act, Colony Laws, May 1, 1765; Mass. Laws, vol. 1, p. 726; Smith's Laws of Maine, March 19, 1821; R. S., c. 61; Prov. Stat. 23 George III., c. 5, (1749.)

*S. Fessenden, & W. P. Fessenden,* for defendant.

Whatever this grant may be construed to convey, the first question is, had the king power to convey in manner he has undertaken. 5 Comyn's Dig. title Navigation, A, p. 102. For the definition of Sea, vid. 2 Roll. 169, L, 20.

The king has the property *tam aquæ quam soli* and all profit in the sea and navigable rivers. Cal. 17; Dav. 56, 57. So the property of the soil in navigable rivers which have the flux and reflux of the sea belongs to the king. 1 Siderfin, 148, 149. *Ball* v. *Herbert,* 3 Term R. 253.

The soil between high and low water mark is part of the county, and may be within a manor. 5 Bacon, title Prerogative, B, p. 494.

Such soil it would seem that the lord of manor might take and hold by grant or prescription.

A subject by grant or prescription may have the water and soil of navigable rivers, as the city of London has the soil and property of the Thames by grant. R. Dav. 56, b.

From this case I infer, 1st, that the Legislature has the power to grant the soil of a navigable river.

2. That a grant of the soil of such stream in connection with the land, will not necessarily grant the exclusive use of the water or the fish swimming therein.

3. That the Legislature has the power to grant with the soil a several fishery in the same. But as this is in dero-

gation of common right, it will not pass without express words of grant. By the express terms of our grant the right to all the fishings with a single exception, which does not touch the taking of clams, is conveyed to us. And this being done, no Legislature has a constitutional right to take it away from us. In *Rogers* v. *Jones*, 1 Wend. 237, the opinion of Mr. Justice WOODWORTH is especially commended to the attention of the Court. In *Carter* v. *Murat*, 4 Burrows, 2162, the same ground is fully sustained.

The case of *Cottrill* v. *Myrick*, 12 Maine, 222, decides that such streams as the Damariscotta river are subject to the control of the Legislature so far as to appropriate the fish therein by a grant of an exclusive right to all .the fish in the towns of Newcastle and Nobleborough for their emolument; it would seem to follow that the granting power would have a right to appropriate a fishery in an arm of the sea, or creek, by grant to an individual.

If the grant to Georges was in trust, it must be an implied trust. There are no words in the conveyance which would show a trust. It is said to be implied from the objects of the grant. If land covered by water and the fisheries, were conveyed in trust, why not the land covered by wood? Was there any difference in the terms of the grant between land covered with water and land covered with wood. Both are conveyed by the same terms, and if one is in trust, so is the other.

If the second proposition taken by plaintiff were conceded, that clams are shell-fish, and that there might be such a thing as a clam fishery, the question returns, did not that species of fishing pass by the grant to the extent of its boundaries? In any grant ever made was a right to clams ever contemplated to be exempted? *Bagot* v. *Orr*, 2 Bos. & Pull. 472.

As late as 1825, in *Brown* v. *Stratton*, 4 Barn. & Cress. 485, (10 Com. Law, 384,) the position that the king may convey to a subject, since Magna Carta, the lands and fisheries of every description, between high and low water mark,

is most clearly recognized and settled. Also the king may grant land covered by the sea. *Low* v. *Gavat*, 3 Barn. & Adol. 967, (23 C. L. 203.)

The case of *Parker* v. *Cutler Mill-Dam Cor.*, 7 Shepl. 353, appears to imply that an appropriation of a clam fishery to private use might be made. Vide Greenl. Cruise, title 27, Franchise, § 3; 3 Kent's Com. 416; 4 Mass. 522; *Guild* v. *James*, 6 Cow. 369; Angell on Tide Waters, c. 5, 7; 17 Johns. 195.

If the position taken by plaintiff is true, that since the passage of Magna Carta, the king of England is only trustee of all his subjects of this right, then the government here, which is the successor of the king in such trust, is only the trustee of all the people here, and has no more right to alienate or grant the same to individuals or corporations than the king had in England.

Therefore, the granting to the town of Scarborough the right to control the taking of clams, &c. is against common right and inoperative.

The Colonial ordinance of 1641 is a part of our law. 25 Maine, 64. The owner of upland to which flats adjoin, may sell the upland without the flats, or the flats without the upland. 6 Mass. 435.

Does the Act of this State in relation to the owner of those flats destroy his common right of fishery? We contend it cannot have this operation and is for this reason void.

So a man by grant or prescription may have a free fishery in navigable waters. Callis, 26; Com. Dig. vol 5, p. 290, title Piscary. By a grant of a separate fishery, the grantee should have the soil. 2 Black. Com. 39. A several fishery is presumed to comprehend the soil till the contrary appears. 5 Burr. 2814.

The several kinds of fishery are clearly set forth in note 181, 3d Coke, lib. 2, cap. 11, 122, a.

To meet the objection to our claim to a several fishery in the clams found and growing in our soil, supposing them to be included in the generic term of fish, we rely upon the

cases cited. The reservation in the grant applies only to such fish as are taken in *nets.* The privilege is confined to taking such fish as are *dried.* Clams are never dried. Drying their *nets.* Clams are never taken in nets. The right therefore, reserved to the public to fish, is not *co-extensive* with that of Sir Ferdinando Georges and his heirs. A clam fishery, or a right to dig and take clams, was never contemplated in the reservation clause.

We say again that the reservation clearly shows an intent to grant to Georges all other kinds not reserved. "*Exceptio probat regulam.*"

A construction, such as is contended for, would be subversive of the rights of the owner of the soil. He could not build a wharf on his own land over a clam bed. If he have clams grown on his own soil, and there can be such a fishery as a clam fishery, then the owner of the soil is the owner of a several clam fishery; and if the king had the power to grant the soil in a creek or arm of the sea, where the tide ebbs and flows, then such a fishery is ours.

We would refer the Court, with great reliance, to the opinion of Mr. Justice THOMPSON, in the case of *Martin v. Waddell,* 16 Pet. 367, as supporting the positions we take upon the facts in this case.

1. The grant to Georges was within the power of the king to make, and was well made.

2. The grant does by proper and apt words convey the land or territory in the grant described, including the land covered by the water of the sea, with all its creeks and inlets.

3. The grant to Georges conveys a right to a several fishery in all the waters covering the land conveyed, and to the extent of the land conveyed, as well the waters of the sea as of the arms of the sea, as the creeks, and inlets, and the rivers where the tide does not flow, with the exception in the deed.

4. That the clam fishery, if it may be so denominated,

passed to the grantee by the terms of the grant, fully and completely, as much as the soil, and as a part thereof.

5. The saving clause has no relation to the clam fishery.

It is a new idea that a person owning lands bounded by the sea, has no right of the clam beds on his flats, where those flats do not extend one hundred rods from high water mark. Who owns the muscle beds on the flats in Back Cove? They are shell-fish, and very profitable as manure. Have all the people a right to come on to those flats, and remove the clams and muscle beds bordering on the uplands? If a man cultivate a bed of clams, are they liable to be taken by the public? The owners of the muscle beds on the flats scattered along our border do not understand that they are liable to be taken by any one who may desire.

It is apprehended that by our Court the right to appropriate and grant, and regulate the fisheries in navigable waters, as those not navigable, is established upon authority. *Fuller* v. *Spear*, 14 Maine, 417.

That such fishery is a common right, see *Peck* v. *Lockwood*, 5 Day, 22. By that case the digging of shell-fish is a common right. And it then admits that the proprietor of the land may acquire an exclusive right to fish thereon. I cite also 6 Cowen, 369; 3 Cains, 318; 2 Johns. 185; 10 Johns. 236.

Granting that the same construction is to be placed on this charter as on that under consideration in *Martin* v. *Waddell*, there is nothing to show an intention to disconnect the prerogative rights from the power of government granted, and that consequently the right of fishing remains a common right, we say —

1. The defendant does not claim an exclusive right, or rather that such a claim is not necessary to his defence. He claims and possesses a right to fish which cannot be restricted, limited or modified, because it is a grant by the sovereign which he was competent to make.

In the case of *Martin* v. *Waddell*, the original plaintiff claimed, and was endeavoring to enforce an *exclusive* right.

Moulton *v.* Libbey.

It was held that his grantor possessed no such rights, having *surrendered* them.

In this case the question is whether Georges, being the proprietor, could make a valid grant of a "right in common" to enjoy these royalties so as to preclude him as proprietor from all power to limit or restrict his grant. If Georges could not restrict his grant to Cammack, neither could the king limit or restrict his grant to Georges, and the original charter remains subject only to the limitations incorporated in it.

The rights there granted are uncontrollable by the grantor. It was a contract not at variance with the public right nor with any legal principle. It bound the hands of the grantor.

This question, in this aspect of it, is of a right in common, free from any restriction by government. The questions discussed in the cases cited by plaintiff are of *exclusive rights*.

2. It is enough in answer to the 8th point raised by plaintiff, to say that grants are not affected by political changes. They remain unimpaired.

3. On the principles assumed by plaintiff in his 3d and 4th points, he has no title. The plaintiff in error, in *Martin* v. *Waddell*, claimed an exclusive right under a law of New Jersey, which undertook to parcel out "exclusive fishing rights." The case failed for want of title.

The sections of c. 61, R. S., under which this action is brought, are of a similar character. The Legislature attempts to grant to Scarborough in effect an *exclusive right*, inasmuch as it restrains all persons from taking fish beyond a certain quantity, unless under a permit from the selectmen. The selectmen are not bound to give permits. They may do so. The statute therefore takes away the common right of fishing from individuals, even on their own land, and confers the *exclusive* right upon others. So far as this applies to waters more than one hundred rods from high water mark, it is void on the principles assumed by plaintiff.

Moulton *v.* Libbey.

So far as it applies to land owned by individuals between high and low water mark, it is void on the general ground, that, by the principles of universal law, no government can transfer the property of one man to another.

4. The soil of the place where the clams were taken was in the defendant. If by no other title, by the ordinance of 1641, as the owner of the upland. The clams are the growth of his soil. The rights of the public under the ordinance are of navigation only. That right we may terminate by occupation.

The Act then gives no ground of action against the defendant.

1. Because he holds under a grant of title valid and legal and at variance with no common right.

2. Because the Act on which plaintiff relies is an exercise of power not conferred on the Legislature.

The closing argument for plaintiff was furnished by *Clifford & Appleton*, in which the points assumed in the opening were sustained at great length, and the defendant's positions controverted.

SHEPLEY, C. J. — The plaintiff's right to recover is, by the report, made to depend upon the sufficiency of the defence to prevent it. If the Court is " of opinion, that the facts set up in defence would not constitute a defence, then the defendant is to be defaulted."

The facts presented in defence are, an attested copy of a " charter of the Province of Mayne," from Charles, king of England to Sir Ferdinando Georges, bearing date on the third day of April, in the fifteenth year of his reign. And an attested copy of a conveyance from Georges to Thomas Cammack of fifteen hundred acres of land described made on March 15, 1640. An admission, that the premises described in the declaration, where the clams were taken, were included in the conveyance to Cammack; and that the defendant may have the same title to them, which Cammack had.

The other ground of defence is derived from a long established custom of taking clams by the owners of the premises.

The defendant's right to take the clams is, therefore, made to rest upon the basis of title, and upon that of a long established usage.

Assuming that the defendant has acquired all the title, which Georges could convey, a question might be made, whether he could thereby acquire any title to the flats land between high and low water mark. It is not deemed to be important to consider such a question, for by the ordinance of 1641, which has been received as conferring title in this State, the defendant would acquire title to the premises.

The question therefore presented by this branch of the defence is, whether the defendant by becoming owner of the flats acquired any exclusive right to the fisheries upon them in the tide waters.

By the common law, as presented from its earliest time to the present in elementary treatises and judicial decisions without any dissent, the people have "a liberty of fishing in the sea or creeks or arms thereof as a public common piscary, and may not without injury to their right be restrained of it, unless in such places, creeks or navigable rivers, where either the king or some particular subject hath acquired a propriety exclusive of that common liberty."

The shores of the sea and navigable rivers, within the flux and reflux of the tide, belong *prima facie* to the king, and may belong to a subject. "The *jus privatum* of the owner or proprietor is charged with, and subject to that *jus publicum* which belongs to the king's subjects." Hale, De Jure Maris, c. 6 ; De Portibus Maris, c. 7. Whatever right the king had by his royal prerogative in the shores of the sea and of navigable rivers, he held as a *jus publicum* in trust for the benefit of the people for the purposes of navigation and of fishery. These positions have been approved in judicial decisions too numerous to be mentioned.

They are not known to have been denied by any respectable authority.

The title of the defendant to impair this common right of fishery and to assert an exclusive right may be more conveniently considered as derived in the first place from Georges, and in the second place, from the ordinance of 1641.

The grant from the king to Georges, is of " all and singular the soils and grounds thereof, as well dry as covered with waters," " together with the fishing of what kind soever as well pearls as fish, as whales, sturgeons, or any other, either in the sea or in rivers."

If this grant were considered without the saving clause hereafter to be noticed, it might not be difficult to ascertain its true construction. The grant of fishing is as extensive in the sea as in the rivers. The idea of an exclusive grant to fish in any part of the sea, that must destroy the common right, cannot be received. If it be alleged, that the grant should be permitted to operate upon the shores, where by law it might; it is to be observed, that the whole language of the grant is to be considered for the purpose of ascertaining its true construction. That it is apparent from an examination of the whole instrument to have been the intention to transfer from the king to Georges within the bounds of the territory granted the same rights, which the king had either by the *jus privatum* or *jus publicum.* The *jus publicum* he held in trust for the common benefit of the subject. There is no indication of an intention to violate that trust by its transfer to another; and his grantee would take subject to it.

" The *jus privatum* that is acquired to the subject, either by patent or prescription, must not prejudice the *jus publicum* wherewith public rivers and arms of the sea are affected." Hale, *De Jure Maris.*

" The king had the right of soil in the shore in general; but the public had the right of way over it, and the king's grantee can only have it subject to the same right." Opin-

ion of Mr. Justice BEST, in case of *Blundell* v. *Catterall,* 5 B. & A. 268.

In the case respecting the fishery of the Banne, it appear- ed, that the king had the fishery as parcel of the ancient in- heritance of the crown, that he granted the territory, where the fishery was, with "*omnia castra messuagia*," &c., "*pis- caris, piscationes, aquas*," &c. ; and it was held, that the fishery of the Banne did not pass by the grant of the land and the general grant of all piscaries. That general words in a grant by the king would not pass such a special royal- ty. Davis, 55. This case and the construction was approv- ed by the opinion in the case of *Somerset* v. *Tazwell,* 5 B. & C. 875.

If such language must be so construed as not to convey a private fishery, which the king might lawfully convey, much less should it be construed in this conveyance so as to im- pair rights, which he held in trust and could not convey dis- charged of it without a violation of duty. " And it has been frequently held, that the king takes this right of soil in trust for the public, so far as the fishery is concerned, and al- though the king may grant away this right of soil to another, yet his grantee will take it subject to the same trust; and by such grant, however comprehensive in its terms, the pub- lic, that is the king's subjects, cannot be deprived of their common right." *Weston* v. *Sampson,* 8 Cush. 352. In the construction of a grant made to the Duke of York, of a cha- racter very similar to that of the grant to Georges, the opinion states, " if the right of common fishery for the com- mon people stated by Hale, in the passage before quoted was intended to be withdrawn, the design to make this im- portant change in this particular territory would have been clearly indicated by appropriate terms, and would not have been left for inference from ambiguous language." *Martin* v. *Waddell,* 16 Peters, 367. Mr. Justice THOMPSON in his dissenting opinion in that case, says, " the sovereign power itself, therefore, cannot consistently with the principles of the law of nature and the constitution of a well ordered

society make a direct and absolute grant of the waters of the State divesting all the citizens of a common right. It would be a grievance, which never could be long borne by a free people." If so, no grant of the sovereign power capable of any other should receive a construction, that would destroy or impair any right held in trust for the common benefit of the people.

If however there may be doubt respecting the legal construction of the grant to Georges, when considered without the saving clause, there can be none, when that is noticed as part of the instrument. That clause contains these words — "Saving always to all subjects of our kingdom of England liberty of fishing as well in the sea as in the creeks of said province and premises aforesaid, and drying of their fish and drying their nets ashore of the said province and the premises, any thing to the contrary thereof notwithstanding." The common right of fishery is thus clearly reserved and preserved for the king's subjects.

It is insisted, that although the liberty of fishing in the creeks as well as in the sea may be saved, yet that liberty is restricted to the taking of such fish as may be and are usually dried on the shore. This construction is inadmissible, both upon general rules, and upon the use of the language. By general rules a construction, which would allow a grant of the king to diminish a common right, is to be rejected, unless it be so clearly and fully expressed as to be incapable of any other reasonable construction. The language respecting the drying of fish and of nets according to its literal and grammatical construction does not restrict the liberty to take all kinds of fish. It saves to his subjects other and further rights than they had by the common law, those of drying their fish and nets "ashore." This saving of additional rights to them exhibits a general intention not only to preserve to them their common right of fishery, but to afford unusual facilities for its exercise.

The third position presented by the counsel for the defendant asserts, "that the grant to Georges conveys a right

to a several fishery in all the waters covering the land conveyed."

A several fishery is an exclusive one. No other person can lawfully fish within its bounds. A construction of the grant, which would make it convey such a fishery, would not only destroy the whole effect of the saving clause, but it would exclude all the people from fisheries of every description in the sea and tide waters within the bounds of the territory.

It will not be necessary to offer any examination of the ordinance, or any argument to prove that a title to the shore acquired by it does not destroy the common right of navigation or of fishery. Its construction with reference to the rights of fishery was considered in the case of *Parker* v. *The Cutler Mill-dam Co.* 20 Maine, 353, and no error in it has yet been perceived. If needing support, it may be found in the opinion of the Court in the case of *Weston* v. *Sampson*, 8 Cush. 347, in which it is said, "It is quite certain, we think, that the mere fact that the *jus privatum* or right of soil was vested in an individual owner does not necessarily exclude the existence of a *jus publicum* or right of fishery in the public." If the title vested in the owner does not necessarily exclude the common right of fishery, that cannot be affected by a title to the soil merely; and the ordinance does not attempt to impart any exclusive right of fishery to such owner.

The defendant therefore fails to show that he has acquired either under the grant to Georges or under the ordinance, any right of fishing in the premises inconsistent with the common right of all the people.

If this be so, his counsel insists that the common right of fishery does not include the fishery of clams, which are taken out of the soil.

In all the treatises respecting that common right, the general term "*piscaria*," or its equivalent, is used as including all fisheries, without any regard to their distinctive character, or to the method of taking the fish. There are many

kinds of fishery recognized in them, and in judicial decisions; but the general term is uniformly used not with reference to any one of them, unless that one be particularly named, but as including them all. The fact that the soil between high and low water mark may be dug up or disturbed to take oysters and clams, would have no tendency to prove that they were not included in the general term, for the king held his title to that soil as a *jus publicum* for the common benefit, and the digging upon it in the exercise of a common right would occasion no injury. That shell-fisheries have ever been regarded as a part of the public fisheries of England, is further shown by the fact that they have been regulated as such by statutes, in which they are denominated fisheries. The oyster fisheries, by 2 George II., c. 19; 31 George III., c. 51. Lobster fisheries, by 9 George II., c. 33. In like manner have the salmon fishery, the herring fishery, the pilchard fishery, and other fisheries been regulated.

The case of *Bagott* v. *Orr*, 2 B. & P. 472, was trespass for taking and carrying away shell-fish and shells in certain closes. The special plea of the defendant alleged that the closes were certain rocks and sands of the sea within the flux and reflux of the tides, that in them every subject had of right the liberty of taking shell-fish and shells. The replication traversed that right. The report states that "the Court were of opinion, that if the plaintiff had it in his power to abridge the common right of the subject to take sea-fish, he should have replied that matter specially, and that not having done so, the defendant must succeed upon his plea, as far as related to the taking of the fish; but observed that as no authority had been cited to support his claim to take shells, they should pause before they established a general right of that kind."

Although no judgment appears to have been rendered, the opinion of the Court respecting the rights of the parties, appears to have been fully and clearly stated. Kent, in his commentaries, refers to the case as so deciding, but in notes

in the different editions he says, it may be considered as overruled, or as shaken by the case of *Blundell* v. *Catterall*, 5 B. & A. 268; 3 Kent, 417. This remark is regarded as erroneous.

The question presented in the case of *Blundell* v. *Catterall*, was, whether the king's subjects had a common right to cross the sea shore with bathing machines to bathe. The decision was against it.

It seems a little extraordinary that a decision denying such a right should be regarded as affecting an opinion that a common right to take shell-fish upon the seashore did exist. Mr. Justice BAYLEY did not regard the two cases as in conflict. He says " the case of *Bagott* v. *Orr* seems to me to conclude nothing on the right in question." After making other remarks upon it, he says, " the claim therefore in that case was very different from the present; it was a claim for something serving to the sustenance of man, not a matter of recreation only; a claim to take, when left by the water, what every subject had an undoubted right to have taken, while they remained in the water; and upon that claim there was no regular judgment. But it would by no means follow because all the king's subjects have a right to fish up fish on the shore, that they have therefore a right to pass over the sea shore for the purpose of bathing." The case was noticed by Mr. Justice BEST, with approbation. The case of *Bagott* v. *Orr* must, therefore, still be regarded as the deliberate and unshaken opinion of the Court, after a full and learned argument by distinguished counsel upon the right now in question.

The case of *Seymour* v. *Lord Courtenay*, 5 Burr. 2814, appears to have been referred to by Mr. Justice THOMPSON, in his opinion in the case of *Martin* v. *Waddell*, as unfavorable to such a conclusion.

The action was trespass for disturbing the plaintiff's several fishery, claimed by a grant from Lord Clifford, with the exception of an oystery, and a reservation of a right to take fish for his own table. The question was, whether the

exception and reservation destroyed the several fishery. Lord Mansfield, as reported, says, " Here Lord Clifford being the general owner demised to the plaintiffs, reserving a particular species of fishery, viz. the oystery, which in its nature is to be exercised in a particular mode." An oystery is here regarded as a " particular species of fishing," and of course included in the common right of fishery. The case, so far as it has any bearing on the present question, is clearly favorable to the common right, and not opposed to it. For oysters as well as clams are often taken out of the soil by digging.

Mr. Justice THOMPSON referred also to the case of *Rogers* v. *Allen*, 1 Camp. 308, for the same purpose. That was an action of trespass for breaking and entering the several oyster fishery of the plaintiff. The special plea of the defendant alleged that the locus was in a navigable river, and arm of the sea; that all the king's subjects had a right there to fish and dredge for oysters. The plaintiffs did not deny that common right, but in their replication prescribed for a several fishery as appurtenant to the manor of Burnham, and attempted to prove it as existing " in very early times." The defendants attempted to disprove the existence of a several fishery, by showing that all persons who chose, had been accustomed to fish there for all sorts of floating fish. In reply to this, among other remarks, Mr. Justice HEATH said, " part of a fishery may be abandoned and another part of more value may be preserved." In the whole case the fishery for oysters is treated as included and as governed by the laws respecting the common right of fishing, unless withdrawn by a prescription for a several fishery, which may as well be applied to a salmon as to an oyster fishery. The case is therefore favorable to the common right as including shell-fish."

No case has been cited or noticed in the English books in which shell-fish have not been regarded as included in the *communis piscaria* of the kingdom. They are so regarded

and spoken of in the opinion of the Court in the case of *Martin* v. *Waddell*.

In the case of *Weston* v. *Sampson*, the question whether shell-fish including clams constituted a part of the common fisheries was very fully considered, and the decision was that they did. This Court may therefore well rest upon its former decision to the same effect, in the case of *Parker* v. *The Cutler Mill-dam Company*, until further light is obtained.

It is with some surprise that an intimation has been noticed that the case of *Moore* v. *Griffin*, 22 Maine, 350, may in principle be opposed to it. The only question in that case having any relation to the subject was whether "the right to take muscle bed manure" from the shore of tide waters was common to every inhabitant of the town. The idea that "muscle bed manure" could constitute any part of a common fishery was not then and cannot now be entertained.

It is insisted in argument, that if a common fishery, by which the soil may be disturbed, can be established, the owner of the shore will be deprived of all right to erect a wharf, or to make improvements upon his own land.

The common right of fishing has always been held and enjoyed in subordination to the right of navigation. Any erection which can be admitted by the latter will not be prevented by the former right.

The remaining ground of defence is, "that he and those under whom he claimed have been accustomed to take clams for a period of sixty years last past, at their free will and pleasure, from the flats described in the plaintiff's declaration."

Such a taking would prove nothing more than a lawful exercise of their common right to do so until they had been precluded by some statute regulation of that common right. Since that time it might amount to a continued violation of a public statute. Every other citizen might before any

statute regulation lawfully conduct in like manner. No legal defence would be presented by the proof proposed.

. Objection is made in defence to the validity of the statute enacted for the regulation of the common right. The right of the plaintiff to have judgment is not by the report made to depend upon such a question. It may be desirable for the purpose of quieting litigation to express an opinion upon it.

That the State as representing the people has the right to regulate such common rights and privileges has been repeatedly declared, by judicial decisions. ·

If those rights are to be regulated, it may be necessary to place the exercise of them under the superintendence and care of some persons to make them as valuable or useful as possible, as well as for their preservation. The law may designate persons holding particular official positions, as well as others for that purpose, and may prescribe their duties. The fifth section of the Act does not deprive any citizen of the right to take clams "for the consumption of himself or family." Or any fisherman of the right to take them for bait for his own use, not exceeding a certain quantity at one time. Those not needed for such uses are not to be taken without a permit from the selectmen or assessors. If they could be taken by all without any limitation of the quantity and for the purpose of sale for profit, the result might be, that they would soon be so much diminished or destroyed, that none desirable would be left for the common use for food or for bait. Such control of them may be rather for their protection, and in furtherance of the enjoyment of the common right. If the agents of the law abuse their trust, they may be discharged, and others may be employed. *Defendant defaulted.*

HOWARD, RICE and CUTTING, J. J., concurred.

A *dissenting* opinion was drawn up by HATHAWAY, J.

Moulton *v.* Libbey.

HATHAWAY, J. — Debt. to recover a penalty for taking clams, in violation of c. 61 of the Revised Statutes, which provides as follows : —

" Section 4. If any person shall take or otherwise wilfully destroy any oysters or other shell-fish, or obstruct their growth in their beds in any of the waters of this State, except as provided in the two following sections, he shall forfeit to the person sueing therefor not less than one dollar nor more than two dollars for each bushel thereof, including the shells so taken and destroyed. Section 5. The selectmen of the town or the assessors of the plantation, wherein such oysters or other shell-fish may be found, may, in writing, authorize any persons to take the same at such times as they shall think proper, and shall express in their permits; and any inhabitant of such town or plantation, or native Indian within this State, may take the same without any permit for the consumption of himself or family, provided, that no person, without such permit shall be allowed to take oysters for any purpose, in the month of June, July or August. Sect. 6. Any fisherman may, without such permit, take any shell-fish suitable for bait, necessary for his use, and in quantity, not exceeding seven bushels including the shells, at any one time."

The case finds, that the defendant took the clams from their beds where they had been accustomed to grow, &c., on the flats between high and low water mark, and within one hundred rods of high water mark. The defendant justifies under claim of title to the land, from which they were taken, by deed from the council of Plymouth, New England, to Thomas Cammack, dated November 1, 1631, and confirmation thereof by Sir Ferdinando Georges by deed of March 15, 1640, recorded September 24, 1670, and the charter of Charles, King of England, to Georges, which appears to have been duly recorded in 1636.

By the report of the case, the defendant is to be considered as legally holding Cammack's title. The charter to Georges was similar to those granted by Charles II. to the

Duke of York, in 1664 and 1674, and, adopting the language of Taney, C. J., in *Martin & al.* v. *Waddell*, 16 Peters, 367, "The right of the king to make this grant with all its prerogatives and powers of government cannot at this day be questioned." And besides, it is familiar law that a person holding title, by deed recorded, is *prima facia* the owner of the land which his deed purports to convey. The legal presumption is, that seizin follows the title, and that they are coincident, and the case furnishes no evidence of possession or title in the plaintiff adverse to the defendant. The question presented, therefore, is simply concerning the right of a person owning lands bounded by the sea, or by a navigable river, to dig and take clams on his flats lying between high and low water mark, or within one hundred rods of high water mark, where the sea ebbs further.

"An exclusive right of fishing in a public river is a royal franchise, and is considered as such in all countries where the feudal polity has prevailed, though the making such grants, and by that means appropriating what seems unnatural to restrain, *the use of running water*, was prohibited by King John's great charter." 2 Black. Com. 39, 417; 4 Black. Com. 424.

King Charles seems to have regarded this prohibition, and the rights of his subjects as protected by it, for although the grant of the fisheries to Georges was quite universal in its scope, yet it was made subject to a specific limitation, "saving always to all our subjects of our kingdom of England, liberty of fishing, as well in the sea as in the creeks of the Province and any the premises." By the common law of England, the title to the land or property in the soil under the sea, and over which the tide waters ebbed and flowed, including the flats on the seashore, lying between high and low water mark, was in the king as the representative of the sovereign power of the country, but this right of property was held by the king in trust for public uses, the principal of which were for fishing and navigation, and these were common to all his subjects. Such being the

common law, the proprietor, of land, bounded by the sea, or by a river where the tide ebbed and flowed, held title to the soil only to high water mark. The right of the public to fish in tide waters was coëxtensive with the king's ownership of the soil over which the waters flowed and ebbed, for the right of property in the sea was *prima facie* vested in the king, as the representative of the public, and he had no other legal tenure in the rights of fishery and navigation, than belonged to him in the character of protector of public and common rights. Angell on Tide Waters, 33.

"Piscarial rights of whatever nature, and in whatever manner acquired, are always subservient to the rights of the public, that is, to the rights of navigation." Angell, 93 to 95. And whether for the purpose of increasing the facilities for commerce and navigation, or for the encouragement of individual enterprise among the inhabitants living on the seacoast, or for both purposes.

The colonists of Massachusetts passed a law, commonly called the Ordinance of 1641, (Ancient Charters, c. 63, of Colony Laws,) by which it was enacted, "Sect. 2. Every inhabitant who is an householder shall have free fishing and fowling in any great ponds, bays, coves and rivers, so far as the sea ebbs and flows, within the precincts of the town, where they dwell, unless the freemen of the same town, or the general court have otherwise appropriated them, provided, that no town shall appropriate to any particular person or persons, any great pond containing more than ten acres of land, and that *no man shall come upon another's propriety*, without their leave, otherwise than as hereafter expressed. *The which clearly to determine*, Sect. 3, It is declared, that in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, *the proprietor of the land adjoining, shall have propriety* to the low water mark, where the sea doth not ebb above a hundred rods, and not more, wheresoever it ebbs further; provided, that such proprietor shall not, by this liberty, have power to stop or hinder the passage of boats or other

vessels in or through any sea, creeks or coves to other men's houses or lands." This Act, which is the common law of Massachusetts and Maine, made a very essential change in the common law of England, as applicable to the colony. It gave to the riparian proprietor, bounded by tide waters, the fee of the soil to low water mark, not exceeding one hundred rods, where the tide ebbed further, instead of limiting his boundary at high water mark, as the law had been before. It divested the sovereign of the ownership of the soil, between high and low water mark, and vested it in the riparian proprietor, subject *only* to the express reservations specified in the Act.

The Act clearly established that the owner of the adjoining upland should have "propriety" to the low water mark, not however exceeding one hundred rods from high water mark, where the tide ebbs further. It established or confirmed the right of free fishing and fowling in tide waters, *subject to the proviso,* that no man should "come upon another's propriety without their leave," excepting *only,* that such proprietor should not have power to stop or hinder the passage of boats or other vessels, in or through any sea, creeks or coves to other men's houses or lands." The language of the colonial law is plain, and the rights of the proprietor of the soil, and of the public under its provisions, seem to be entirely free from complication or uncertainty. There is no doubt of the right of the government to regulate the fisheries, both in navigable *waters* and in those which are not navigable.

If the government had not such power, the migratory fish, such as salmon, shad and alewives, &c., which can be perpetuated only by allowing them to ascend the streams and deposite their spawn in the ponds and head waters of the interior, according to their nature, might soon become extinct. That right is too well established by a long course of salutary legislation to be questioned. But clams grow in their beds, between high and low water mark, and are dug therefrom, when the ground is uncovered with water;

they are attached to the soil, and are part of it, and it was competent for the colonial government to grant the soil to the riparian proprietors.

The constructions of the ordinance by the courts of Massachusetts, prior to the compilation of Dane's Abridgment, were carefully collected by the learned author of that work, vol. 2, c. 68; and the subject was very thoroughly considered in *Commonwealth v. Alger*, 7 Cush. 53; and all the authorities touching the questions of its construction and effect, examined, and the conclusions to which the Court arrived in that case were expressed in their opinion delivered by SHAW, C. J. "That it was an authoritative declaration of owners having a full right of property, and power of disposal annexing additional land to that previously granted to hold in fee, subject to a reserved easement, and if not strictly a grant it partook of most of the characteristics of a grant and could not be revoked by the power that gave it. That the ordinance made no alteration in the use of places there described *while they were covered with water*," but that the riparian proprietor was "restricted from such a use of the property granted as would impair the public right of passing over the water in boats and other vessels through any sea, creeks or coves to other men's houses or lands, and could lawfully erect nothing upon the flats which would obstruct or hinder such passage over the water, so as to constitute a public nuisance." See also *Low* v. *Knowlton*, and *Gerrish* v. *Proprietors of Union Wharf*, 26 Maine, 128 and 384.

The ordinance of 1641 is our common law, and it should be observed that the decisions of the courts principally relied upon by the plaintiff as authority, and also the doctrines of the elementary writers, are based upon the common law of England, and can, therefore, have no effect as authority when conflicting with the provisions of the Colonial law.

The counsel for the plaintiff, however, relies upon the case of *Parker* v. *The Cutler Mill-dam Company*, 20 Maine,

353, and *Weston & al.* v. *Sampson & al.*, 8 Cush. 347, as conclusive in his behalf.   The case of *Parker* v. *The Cutler Mill-dam Company* does not decide that a person can be lawfully prevented from digging clams on his own flats; nor does it decide that the common right of fishing in this State extends to the taking of shell-fish on the shore of a navigable river, when the tide is out.

The language of the present Chief Justice, delivering the opinion of the Court in that case, was in these words:— "In *Bagott* v. *Orr*, 2 B. & P., 472, this right was decided to extend to the taking of shell-fish, on the shore of a navigable river," and Angell, on Tide Waters, also, p. 24, said "the Court, in case of *Bagott* v. *Orr*, expressly recognized the doctrine that it is a right common to every subject to take shell-fish on the shore by digging up the·soil," and Chancelor KENT, in his Commentaries, vol. 3, p. 417, said, "it has been decided that though the sea shore, between high and low water mark, be held by grant as private property, the common right still exists to go there and fish, and even to dig and take shell-fish; and if the owner of the soil claims an exclusive right he must show a prescription for it, controlling the general right at common law," and cites *Bagott* v. *Orr*, and *Peck* v. *Lockwood*, 5 Day, 22, as the only authorities to sustain his text, and adds in a note to his first edition, "but the case of *Bagott* v. *Orr*, may be considered as overruled by that of *Blundell* v. *Catterall*, 5 Barn. & Ald. 268, and the doctrine of *Peck* v. *Lockwood* seems to be very questionable;" and by recurring to the opinion of the Court in *Peck* v. *Lockwood*, it will be perceived that *Bagott* v. *Orr* is the authority upon which that case also was decided.

We have here a goodly superstructure of authorities, all resting upon one case, which the learned Chancelor. who cites it informs us had been overruled.

But the case of *Bagott* v. *Orr* concludes nothing upon the right in question, nor is there any apparent reason for saying it has been overruled.   The case seems to have been

misapprehended. The opinion of the Court therein, which was very brief, only recognized the unquestioned principle that, by the common law of England, the subject, *prima facie*, had a right to take sea-fish; and *decided* that if the plaintiff had it in his power to abridge that right "he should have replied that matter specially." The decision was upon the pleadings.

The case of *Weston & al.* v. *Sampson & al.* 8 Cush. 347, relies also upon *Bagott* v. *Orr* and *Peck* v. *Lockwood* before cited. In that case the Court held, "that when flats are left wholly open to the natural ebb and flow of the tide, unoccupied by the upland proprietor, the right of fishing exists on the part of the public, and that the law in this respect makes no difference between swimming or floating fish and shell-fish, and the Court held, that the defendants having gone in their boat upon the plaintiff's flats when they were covered with water, and after remaining there till the tide was out, dug five bushels of clams and put them into their boat, and departed with them therein, on the returning flood tide, that their ingress and egress having *been by water*, they were not trespassers. The Court, in that case, has the merit of directly deciding a question in Massachusetts, which had never before been decided in Massachusetts or Maine, and whether or not that decision be in accordance with the rights of soil as established and confirmed to the riparian proprietors, by the colonial law, or in conformity with the uniform course of decisions of the Courts, whenever the rights of parties under that law have been presented for their consideration, are questions which need not be considered in this case.

"When the Revolution took place, the people of each State became themselves sovereign, and in that character held the *absolute right* to all their navigable waters and the soils under them, for their own common use, subject only to the rights *since* surrendered by the constitution to the general government; a grant made by their authority, must therefore manifestly be tried and determined by different

principles from those which apply to the grants of the British crown, where the title is held by a single individual, in trust for the whole nation." Per TANEY, C. J., *Martin & al.* v. *Waddell,* 16 Peters, 410. "The power of the Commonwealth, by the Legislature, over the sea, its shores, bays and coves, and all tide waters, *is not limited,* like that of the crown, at common law." *Commonwealth* v. *Alger,* 7 Cush. 82, and authorities there cited.

The colonial ordinance of 1641 was adopted by the Commonwealth of Massachusetts, and is common law there and in this State, with all the effect and force of a statute, and it has the sanction of the judicial tribunals, as having the effect of a *valid and irrevocable grant* of the fee in the soil to the riparian proprietors, subject only to the express reservations contained therein. *Commonwealth* v. *Alger,* before cited.

The counsel for the plaintiff relies, with much stress, upon some remarks made by the Judge who delivered the opinion of the Court in *Parker* v. *Cutler Mill-dam Co.* 20 Maine, 353, by whom it was said, that "it cannot be readily admitted, under such a state of legislation, to have been the intention of the Legislature, by that ordinance, to part with any of the public rights of fishery." The high character of the Judge, by whom those remarks were made, entitle them to the most respectful consideration. But the conclusion cannot be avoided, that it is to be presumed, and should be admitted, that the Colonial Legislature intended to do precisely what they expressed their intention to do, by the language used in that ordinance. By its phraseology, which is marked and peculiar, *to wit,* "*the which more clearly to determine,*" &c., it seems to have been their manifest intention, to enact the law in language so plain that it could not be misunderstood, and there is no ambiguity in it, either in the grant, the provisos or reservations; every thing is clearly and accurately *expressed.*

The riparian proprietor, bounded by tide waters, in this State, has the same title to his flats, between high and low

water mark, as one has holding such flats in England, as part of his manor, under a *valid* grant from the crown, or by prescription, which implies such grant, deducting only such portion of his absolute title, as was withheld from him, by the provisions of the ordinance of 1641.

Where the flats belong to the riparian proprietor, there is a marked distinction with respect to the right of fishery, in relation to floating fish, and those shell-fish which grow in beds between high and low water mark, and which are taken *only* when the ground is uncovered with water. The latter are local and connected with the soil, and constitute a part of it. In *Constable's case*, 5 Coke, 107, "It was resolved, that the soil upon which the sea floweth and ebbeth, *scil* between high water mark and low water mark, may be parcel of the manor of a subject, and that when the sea floweth and hath *plenitudinem maris*, the admiralty shall have jurisdiction of every thing done upon the water, between the high water mark and low water mark, yet when the sea doth ebb, the land may belong to a subject, and every thing done upon the land, when the sea is ebbed, shall be tried at the common law, for the same is then part of the county." And "evidence, to prove the shore parcel of a manor, disproves the general right of all the king's subjects on the shore, at least when and where it is not covered with water." *Hale, De Jure Maris*, 26, 27. Opinion of HOLROYD, J., in *Blundell* v. *Catterall*, before cited; *Carter & al.* v. *Mencott & al.* 4 Burr. 2162.

Whatever may be the effect of the statute, upon which this action was brought, as applicable to shell-fish, which grow and are taken below low water mark, and below one hundred rods from high water mark, where the tide ebbs further, and also to the taking of such shell-fish between high and low water mark, as may be taken when the flats are covered with water, is not material, in this case. But to give the statute a construction, which would prohibit the owner of the soil from digging and taking clams, at his pleasure, on his own flats, when uncovered with water, "from

their beds, where they had been accustomed to grow," would be authorizing a violation of his rights of property in the land, between high and low water mark, which was granted, and intended to be secured to him, by the Colonial ordinance, and would, in my opinion, be entirely unjustifiable by law. And upon the facts presented by the report, I think, this action cannot be lawfully maintained.