Edward B. BELL, et al.

v.

TOWN OF WELLS, et al.

Supreme Judicial Court of Maine.

Argued Sept. 21, 1988.
Decided March 30, 1989.

Sidney St. F. Thaxter (orally), John D. Gleason, Sharon L. McHold, Lawrence C. Walden, Nancy C. Ziegler, Curtis, Thaxter, Stevens, Broder & Micoleau, Portland, George L. Haskins, Hancock, for plaintiffs.

Tybe Brett, Todd Burrows, Orlando Delogu, Alison Rieser, University of Maine School of Law and Marine Law Institute, Portland, amici curiae.

James E. Tierney, Atty. Gen, Paul Stern (orally), Asst. Atty. Gen., Thomas D. Warren, Deputy Atty. Gen., Philip F.W. Ahrens, III, Deputy Atty. Gen., Augusta, for State Bureau of Public Lands.

Michael T. Healy (orally), William C. Knowles, Verrill & Dana, Portland, for Town of Wells.

Harrison L. Richardson, Barri Lyn Bloom, Elizabeth G. Stouder, Richardson & Troubh, Portland, Richard Emmet, Everett B. Carson, N.R.C.M., Augusta, for Conservation Law Foundation and Natural Resources Council of Maine.

Ralph W. Austin, Jensen, Baird, Gardner & Henry, Kennebunk, guardian ad litem.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

McKUSICK, Chief Justice.

In their quiet title action initiated in 1984 against the Town of Wells, the State Bureau of Public Lands, and various individuals,[1] Edward B. Bell and other owners of land bounded by the sea at Moody Beach in Wells[2] sought a judicial declaration and injunction limiting the use the public may make of the beach. After a four-week bench trial, the Superior Court (York County; *Brodrick, J.*) on October 1, 1987, entered judgments in plaintiffs' favor declaring the state of the legal title to Moody Beach. In doing so, the court reviewed and applied the rules of property law governing the ownership of intertidal land[3] in Maine, declared the Public Trust in Intertidal Land Act[4] unconstitutional, and made a factual determination that the public had acquired no easement over Moody Beach by local custom or otherwise.[5] On the present appeal,[6] we affirm.

■ We agree with the Superior Court's declaration of the state of the legal title to Moody Beach. Long and firmly established rules of property law dictate that the plaintiff oceanfront owners at Moody Beach hold title in fee to the intertidal land subject to an easement, to be broadly construed, permitting public use only for fishing, fowling, and navigation (whether for recreation or business) and any other uses reasonably incidental or related thereto. Although contemporary public needs for recreation are clearly much broader, the courts and the legislature cannot simply alter these long-established property rights to accommodate new recreational needs; constitutional prohibitions on the taking of private property without compensation must be considered. On this basis we agree with the Superior Court's conclusion that the Public Trust in Intertidal Land Act, which declares an unlimited right in the public to use the intertidal land for "recreation," is unconstitutional. Finally, on the record in this case no public easement by local custom has been proven to exist at Moody Beach,[7] even assuming—as need not be decided in this case—that in

1. Originally named as defendants were all users of plaintiffs' property other than persons claiming under instruments recorded in the York County Registry of Deeds. The Superior Court granted status as intervenor–defendants to the Conservation Law Foundation and the Natural Resources Council of Maine, and also to about 40 owners (known as Tier II defendants) of non-oceanfront lots located on the other side of Ocean Avenue from Moody Beach.

2. Owners of 45 oceanfront lots at Moody Beach originally joined as plaintiffs in this action, but in the course of the litigation the owners of 17 lots withdrew or were dismissed. The plaintiff owners of the remaining 28 lots are now appellees before this court. The case authorities and briefs variously refer to the holders of title to such lots as oceanfront, upland, riparian, or littoral owners.

3. Intertidal land means "land ... affected by the tides between the mean high watermark and either 100 rods seaward from the high watermark or the mean low watermark, whichever is closer to the mean high watermark." 12 M.R.S.A. § 572 (Supp.1988). That definition derives directly from the Colonial Ordinance of 1641–47. *See Bell v. Town of Wells (Bell I),* 510 A.2d 509, 512 (Me.1986). At times the alternative terms "flats," "foreshore," and "beachfront" are used.

4. 12 M.R.S.A. §§ 571–573 (Supp.1988), enacted during the pendency of this litigation by P.L. 1985, ch. 782 (eff. July 16, 1986).

5. At trial defendants, in addition to relying on the doctrine of local custom, asserted that the public had acquired rights to use the intertidal zone based on the doctrines of easement by prescription and implied dedication. The Superior Court also rejected the prescription and dedication claims, and no party has pursued those issues on appeal.

6. All defendants have joined in this appeal with the exception of the Tier II defendants. See n. 1 above. For convenience, this opinion refers collectively to the appealing defendants as the Town of Wells. We have received comprehensive briefs and reply briefs from all the appealing defendants, as well as an extensive amicus curiae brief supporting defendants' position from named individuals associated with the University of Maine School of Law and the Marine Law Institute.

7. The public by their claim based on local custom asserted a right to use the dry sand area as well as the intertidal zone. At trial the Tier II defendants asserted that they had acquired a private and personal easement to use the intertidal zone at Moody Beach, regardless of whether the public at large enjoyed such a right. The Superior Court rejected their claim, and the Tier II defendants have not joined this appeal.

Maine a public easement may be acquired over privately owned land by local custom.

### The Facts

Moody Beach is a sandy beach located within the Town of Wells. It is about a mile long and lies between Moody Point on the north, the Ogunquit town line on the south, the Atlantic Ocean on the east, and a seawall on the west. Moody Beach has a wide intertidal zone with a strip of dry sand above the mean high water mark. More than one hundred privately owned lots front on the ocean at Moody Beach. In addition, the Town of Wells in the past has acquired by eminent domain three lots which it uses for public access to the ocean. Each plaintiff now before the court owns a house or cottage situated on one of 28 private oceanfront lots. Each lot is about 50 feet wide and is bordered on the west by Ocean Avenue. At trial, the parties stipulated that the plaintiff oceanfront owners hold title to the parcels described in their deeds in fee simple absolute and that their parcels were bounded on the Atlantic Ocean. A public beach, now known as Ogunquit Beach, lies immediately to the south of Moody Beach; the Village of Ogunquit acquired that beach by eminent domain in 1925.

The evidence at trial regarding the history of public recreational use of Moody Beach was inconclusive. Dr. Edwin Churchill, chief curator of the Maine State Museum, testified that visitors to 17th century Maine used the beaches and a number of hotels were operating in the Wells area by the latter half of the 19th century. An 1865 history of Wells specifically refers to a "large hotel on the beach which is much patronized in summer by persons who are in search of sea air and bathing." Dr. Churchill testified that the beach in question was Wells Beach but that Wells Beach then encompassed the areas now known as Ogunquit, Moody, and Wells Beaches. Recreational activities took place on the beaches of Cape Elizabeth and Kennebunk, and Dr. Churchill inferred that similar activities occurred on the beaches of Wells in the 19th century. Dr. Churchill, however, found no specific reference to recreational activity in the particular area now known as Moody Beach.

The testimony regarding more recent public recreational use of Moody Beach was conflicting. Defendants' witnesses testified that they always had considered Moody Beach public and that the public had used the beach for general recreational purposes for as long as they could remember. On the whole evidence, however, the Superior Court found:

> The only open and continuous public use ... proved to exist in this case for the 20 years preceding the filing of this lawsuit ... was the public's (and the plaintiffs' for that matter) consistent habit of strolling up and down the length of Moody Beach. All of the plaintiffs testified that they were perfectly willing to permit this, never complained about it and would continue to permit this activity in the future.

### I.

### The Public Easement in the Privately Owned Intertidal Land Does Not Extend Beyond That Reserved in the Colonial Ordinance Broadly Construed

#### A. The Upland Owner's Fee Title to Intertidal Land

On the first appeal in this case, we examined in detail the historical sources of the legal regime governing the ownership of intertidal land in Maine. *Bell v. Town of Wells*, 510 A.2d 509 (Me.1986) (*Bell I*).[8]

---

8. Shortly after filing their complaint, plaintiff oceanfront owners moved to join the State of Maine as a necessary party and the Superior Court granted the motion. In June 1985 the State of Maine and other defendants moved to dismiss plaintiffs' quiet title actions. In granting that motion, the Superior Court held that the State was trustee of public rights in Moody Beach, that this interest made the State an indispensable party, and that the quiet title actions were therefore barred by the doctrine of sovereign immunity.

In *Bell I*, 510 A.2d at 515–18, we vacated that dismissal, holding that plaintiff oceanfront owners, and not the State, presumptively hold fee title to the intertidal land by virtue of the Colonial Ordinance and that the State is not "a

The elaborate legal and historical researches reflected in the extensive briefs filed with us on this second appeal fail to demonstrate any error in the conclusions we reached less than three years ago.

Long before 1820 it was established in the common law of Massachusetts, applicable to its entire territory including the District of Maine, that the owner of shoreland above the mean high water mark presumptively held title in fee to intertidal land subject only to the public's right to fish, fowl, and navigate. *See Storer v. Freeman*, 6 Mass. 435 (1810) (Parsons, C.J.) (involving land in Cape Elizabeth in the District of Maine). That rule of law governing titles to intertidal land had its origin in the Colonial Ordinance of 1641–47 of the Massachusetts Bay Colony and long before the separation of Maine was received into the common law of Massachusetts by long usage and practice throughout the jurisdiction of the Commonwealth. *Id.* at 438. Then, by force of article X, section 3 of the Maine Constitution,[9] that property rule was confirmed as the law of the new State of Maine. Only 11 years later, this court speaking through Chief Justice Mellen categorically rejected an argument that the rule of real property law taken into the

common law from the Colonial Ordinance did not prevail in Maine:

> Ever since [the 1810 decision in *Storer v. Freeman*], as well as long before, *the law on this point has been considered as perfectly at rest;* and we do not feel ourselves at liberty to discuss it as an open question.

*Lapish v. Bangor Bank*, 8 Me. 85, 93 (1831) (emphasis added). The very next year the Massachusetts Supreme Judicial Court, speaking through Chief Justice Shaw, stated of the rule vesting fee ownership of intertidal land in the upland owner:

> [T]he rule in question ... being a settled rule of property, it would be extremely injurious to the stability of titles, and to the peace and interests of the community, to have it seriously drawn in question.

*Barker v. Bates*, 30 Mass. (13 Pick.) 255, 258 (1832) (Colonial Ordinance applies in territory of former Plymouth Colony).[10] *See also Barrows v. McDermott*, 73 Me. 441 (1882) (rule of property law derived from the Colonial Ordinance applies in Piscataquis County, even though originally a part of the Acadia Colony).

The pioneer Supreme Court opinion on coastal property rights, *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), written by Justice Gray, formerly

---

trustee of the public easement in the intertidal zone at Moody Beach." *Id.* at 517. In remanding to the Superior Court, we stated that the Town of Wells and the other defendants "may by proof at trial establish the public right, if any, to use the upland, and the scope of the public right to use the intertidal zone." *Id.* at 518. We suggested the Attorney General could remain in the case to represent the public interest. *Id.* at 519.

**9.** Article X, section 3 of the Maine Constitution read originally and still reads today:

> All laws now in force in this State, and not repugnant to this Constitution, shall remain, and be in force, until altered or repealed by the Legislature, or shall expire by their own limitation.

This provision is derived from the Massachusetts Act of Separation, Mass. Laws 1819, ch. 161. *See Bell I*, 510 A.2d at 514 n. 10.

**10.** Chief Justice Shaw also authored *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851), a leading case construing and applying the Colonial Ordinance. *Alger* emphasized the fee title held by the upland owner in intertidal land:

> [I]t is entirely clear that, since the adoption of the colony ordinance, every grant of land, bounding upon the sea, or any creek, cove, or arm of the sea, and either in terms including flats to low water mark, or bounding the land granted on the sea or salt water, with no terms limiting or restraining the operation of the grant, and where the land and flats have not been severed by any intervening conveyance, has had the legal effect to pass an estate in fee to the grantee, subject to a limited right of way for boats and vessels.

*Id.* at 80–81. Chief Justice Shaw also noted:

> The same principles have been affirmed by a series of decisions of the supreme court of Maine, and the circuit court of the United States in Maine, holding that the principles of the Massachusetts colony ordinance have been established by usage and adoption, and long held as the common law of that state. *Knox v. Pickering*, 7 Greenl. 106; *Dunlap v. Stetson*, 4 Mason 349, 366; *Lapish v. Bangor Bank*, 8 Greenl. 85; *Emerson v. Taylor*, 9 Greenl. 42; *Deering v. Long Wharf*, 12 Shep. 51, 64.

*Id.* at 79.

Chief Justice of the Massachusetts Supreme Judicial Court, emphasizes the uniqueness of the Maine [11] and Massachusetts legal rule governing title to intertidal land or flats:

In Massachusetts, by virtue of an ancient colonial enactment, commonly called the Ordinance of 1641, but really passed in 1647, and remaining in force to this day, the title of the owner of land bounded by tide water extends from high water mark over the shore or flats to low water mark, if not beyond one hundred rods. The private right thus created in the flat is not a mere easement, but a title in fee, which will support a real action, or an action of trespass *quare clausum fregit,* and which may be conveyed by its owner with or without the upland; and which he may build upon or enclose, provided he does not impede the public right of way over it for boats or vessels. But his title is subject to the public rights of navigation and fishery; and therefore, so long as the flats have not been built upon or enclosed, those public rights are not restricted or abridged.... It is because of the ordinance vesting the title in fee of the flats in the owner of the upland, that a conveyance of his land bounding on the tide water, by whatever name, whether "sea," "bay," "harbor" or "river," has been held to include the land below high water mark as far as the grantor owns.

*Id.* at 18–19, 14 S.Ct. at 554–55 (citations omitted).

The brief of the amici curiae contends that the State of Maine on coming into the Union on separation from Massachusetts "obtained title to its intertidal lands under the 'equal footing' doctrine," [12] a doctrine that has been most recently discussed by the United States Supreme Court in *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988).[13] Any such revisionist view of history comes too late by at least 157 years. *See Lapish v. Bangor Bank,* 8 Me. at 93 (1831). Prior to separation the Commonwealth of Massachusetts had already granted to the upland owners fee title in the intertidal land within its entire territory including the District of Maine. Contrary to the amicus argument, there was nothing in the pre–1820 Massachusetts common law governing title to the intertidal zone that was repugnant to the constitution of the new State. As already noted, in absence of such repugnance, article X, section 3 of the Maine Constitution declared that all laws in force in the District of Maine in 1820 would remain in force in the new State. See n. 9 above. Furthermore, article X, section 5 of the new Maine Constitution declared:

All grants of lands ... which have been ... made by the said Commonwealth [of Massachusetts], before the separation of said District [of Maine] shall take place, and having ... effect within the said district, shall continue in full force, after the said district shall become a separate State.

*See* Massachusetts Act of Separation, Mass.Laws 1819, ch. 161, § 1 *Seventh.*[14] The *Phillips Petroleum* decision in 1988 in no way contradicts the plain and carefully explained decision in 1893 in *Shively v. Bowlby,* 152 U.S. at 18–19, 14 S.Ct. at 554–55, that Massachusetts and Maine had much earlier exercised their statehood powers over their intertidal lands and had

---

**11.** Justice Gray wrote:

The rule or principle of the Massachusetts ordinance has been adopted and practised on in Plymouth, *Maine,* Nantucket and Martha's Vineyard, since their union with the Massachusetts Colony under the Massachusetts Province Charter of 1692.

*Shively v. Bowlby,* 152 U.S. 1, 19, 14 S.Ct. 548, 555 (1984) (emphasis added).

**12.** The Town of Wells makes a similar argument.

**13.** The "equal footing" doctrine is based on the principle that new States enter the Union on an equal footing with the original thirteen States.

**14.** The Massachusetts Act of Separation provided by its own terms that it would be incorporated into the Maine Constitution, where it remains in force as article X, section 5. The text of article X, section 5 is omitted from modern printings of the Maine Constitution, but is to be found in the text of the Maine Constitution prefixed to the 1820 Laws of Maine, the 1821 Laws of Maine (vol. 1), and Revised Statutes of 1841, 1857, and 1871.

adopted rules of real property law very different from those prevailing in many other states. 484 U.S. at ——, 108 S.Ct. at 799, 98 L.Ed.2d at 890.

In sum, we have long since declared that in Maine, as in Massachusetts, the upland owner's "title to the shore [is] as ample as to the upland." *State v. Wilson,* 42 Me. 9, 28 (1856). *See also Marshall v. Walker,* 93 Me. 532, 536, 45 A. 497, 498 (1900) ("the proprietor of the main holds the shore ... in fee, like other lands, subject, however, to the jus publicum, the right of the public to use it for the purposes of navigation and of fishery").

### B. *The Public Easement Reserved in Intertidal Land*

■ Starting with the rule of real property law that title to intertidal land is privately held in fee, the only question presented by the present appeal is the scope of the rights that the common law has reserved to the public to use that privately owned land. That reservation of public rights, which we have denominated an easement, *Bell I,* 510 A.2d at 516; *Marshall v. Walker,* 93 Me. at 540, 45 A. at 499, derives its definition from the same Colonial Ordinance that granted the fee to the upland owner. As we said in *Barrows v. McDermott,* 73 Me. at 448, "[w]hen a statute or ordinance has thus [by community acceptance and practice] become a part of the common law of a State, it must be regarded as adopted in its entirety...." [15]

The Colonial Ordinance as received into the common law of Maine and Massachusetts reserved out of the fee title granted to the upland owner a public easement only for fishing, fowling, and navigation. We have held that the public may fish, fowl, or navigate on the privately owned land for pleasure as well as for business or sustenance, *Barrows v. McDermott,* 73 Me. at 449; and we have in other ways given a sympathetically generous interpretation to what is encompassed within the terms "fishing," "fowling," and "navigation," or reasonably incidental or related thereto. For example, the operator of a power boat for hire may pick up and land his passengers on the intertidal land, *Andrews v. King,* 124 Me. 361, 129 A. 298 (1925); and "navigation" also includes the right to travel over frozen waters, *French v. Camp,* 18 Me. 433 (1841), to moor vessels and discharge and take on cargo on intertidal land, *State v. Wilson,* 42 Me. at 24; and, after landing, "to pass freely to the lands and houses of others besides the owners of the flats," *Deering v. Proprietors of Long Wharf,* 25 Me. 51, 65 (1845). Similarly, we have broadly construed "fishing" to include digging for worms, *State v. Lemar,* 147 Me. 405, 87 A.2d 886 (1952), clams, *State v. Leavitt,* 105 Me. 76, 72 A. 875 (1909), and shellfish, *Moulton v. Libbey,* 37 Me. 472 (1854). We have never, however, decided a question of the scope of the intertidal public easement except by referring to the three specific public uses reserved in the Ordinance. The terms "fishing," "fowling," and "navigation," liberally interpreted,[16] delimit the public's right to use this privately owned land.

Plainly the general recreational easement claimed by the Town of Wells cannot be justified as encompassed within or reasonably related to fishing, fowling, or navigation. The Town of Wells does not attempt any such justification. Instead, it argues that the public rights of fishing, fowling, and navigation are not exclusive; that the

---

**15.** Although the Superior Court found as historical fact that the framers of the Colonial Ordinance did not intend to curtail the public use of the intertidal zone that was current at the time for travel and for driving and resting cattle, the Superior Court also found:

> This right by necessity and usage apparently did not survive long enough to be formally approved by the courts as a common law right....

At least by 1810, when the Massachusetts Supreme Judicial Court declared the state of the title to intertidal land in Cape Elizabeth in the District of Maine, the Colonial Ordinance in its entirety had been received as the full compass of applicable common law principles. *See Storer v. Freeman,* 6 Mass. 435 (1810).

**16.** Even a liberal construction of what is incidental to fishing or navigation does not authorize an "ice-cutter ... temporarily to incumber another's flats with the snow scraped from his ice." *McFadden v. Haynes & DeWitt Ice Co.,* 86 Me. 319, 324, 29 A. 1068, 1069 (1894).

listing does not exhaust the public rights retained by the common law out of the property interest vested in the upland owner. The Town points to evidence of colonial use of beaches for swimming and football and other games. We do not find the Town's argument persuasive. By itself, the historical fact of recreational activities on privately owned land, whether intertidal or other land, says little as to who was engaging in those activities or what was the scope of any legal rights of the public to be there. Activities of an inconsequential and nonintrusive nature—even if they were in fact public activities—might well have had the acquiescence and participation of the private owners, as the Superior Court found was the case with regard to the modern-day strolling the length of Moody Beach. In any event, all the cases in Massachusetts and Maine recognizing the common law principles of intertidal property interests read the Colonial Ordinance as having restricted the reserved public easement to fishing, fowling, and navigation and related uses. For example, this court in *Marshall v. Walker*, 93 Me. at 536, 45 A. at 498, in declaring the nature of the *jus publicum* in the intertidal land as "the right of the public to use it for the purposes of navigation and of fishery,"[17] set forth only activities related to those specified uses in the following oft-quoted summary:

> Others may sail over them, may moor their craft upon them, may allow their vessels to rest upon the soil when bare, *may land and walk upon them*, may ride or skate over them when covered with water bearing ice, may fish in the water over them, may dig shell fish in them, may take sea manure from them, but may not take shells or mussel manure or deposit scrapings of snow upon the ice over them.

*Id.* at 536–37, 45 A. at 498 (emphasis added). Plainly *Marshall v. Walker* is no authority for permitting public use of intertidal land for general recreational purposes.

A related argument, also made by the Town of Wells, is one that was put forth by an amicus curiae before the justices of the Massachusetts Supreme Judicial Court in 1974 when they were considering the question of the scope of the public easement in the intertidal zone. That argument was that

> we should interpret the colonial ordinance as vesting ... the right to allow all significant public uses in the seashore[;] that while fishing, fowling and navigation may have exhausted those uses in 1647, these public uses change with time and now must be deemed to include the important public interest in recreation.

*Opinion of the Justices*, 365 Mass. 681, 688, 313 N.E.2d 561, 567 (1974) (stating argument of amicus curiae, unanimously rejected by the Massachusetts justices). Our answer is the same as the unanimous opinion of the Massachusetts justices: "[T]he grant [of a fee interest] to private parties effected by the colonial ordinance has never been interpreted to provide the littoral owners only such uncertain and ephemeral rights as would result from such an interpretation." *Id.* No decision of either the Maine or the Massachusetts court supports any such open-ended interpretation of the public uses to which privately owned intertidal land may be subjected.

Maine has no reported case where a claim of a public easement for general recreation such as bathing, sunbathing, and walking on privately owned intertidal land has even been asserted. We cannot accept the argument of the Town of Wells that the absence of precise prior authority in Maine leaves it open for us to disregard the language of the Colonial Ordinance and to fashion a "no more burdensome" public easement that will meet the undoubted needs of modern society for more public recreational facilities. The absence of direct Maine authority is, at best for the Town, a neutral factor in our decision. Furthermore, we do have case authority squarely on point to guide us in deciding the question presented to us in Maine for the first time. Two Massachusetts Supreme Judicial Court cases, decided in 1907

---

**17.** Of course the court's omission of "fowling" was not intentional.

and 1961, as well as the 1974 unanimous advisory opinion of its justices that is quoted above, have considered the exact question raised by this appeal and have ruled adversely to the claim now made by the Town of Wells.

*Butler v. Attorney General,* 195 Mass. 79, 80 N.E. 688 (1907), held that the public easement in intertidal land does not extend to public bathing. The Massachusetts court noted that the Colonial Ordinance mentioned no public rights except for fishing, fowling, and navigation. It reasoned as follows:

> In the seashore the entire property, under the colonial ordinance, is in the individual, subject to the public rights. Among these is, of course, the right of navigation, with such incidental rights as pertain thereto. We think that there is a right to swim or float in or upon public waters as well as to sail upon them. But we do not think that this includes a right to use for bathing purposes, as these words are commonly understood, that part of the beach or shore above low water mark, where the distance to high water mark does not exceed one hundred rods, whether covered with water or not. It is plain, we think, that under the law of Massachusetts there is no reservation or recognition of bathing on the beach as a separate right of property in individuals or the public under the colonial ordinance.

*Id.* at 83–84, 80 N.E. at 689 (citations omitted).

*Michaelson v. Silver Beach Improvement Ass'n,* 342 Mass. 251, 259, 173 N.E.2d 273, 278 (1961), held that an artificial beach in front of the plaintiffs' seashore property created by public dredging became the private property of the plaintiffs by the doctrine of accretion,[18] and held further that the defendant Association of other property owners in the vicinity should be enjoined from using the plaintiffs' newly created beach "for usual bathing purposes, down to the low water mark." Finally, in 1974 the justices of the Massachusetts court ren-

dered a well reasoned opinion that walking along privately owned intertidal land, except to the extent it is incidental to fishing, fowling, or navigation, does not fall within the public easement reserved out of the grant of private ownership by the Colonial Ordinance. *Opinion of the Justices,* 365 Mass. 681, 313 N.E.2d 561. The Massachusetts justices unanimously informed the Massachusetts House of Representatives that a proposed statute creating a "public on-foot free right-of-passage" along the state's seashore between the mean high water line and the extreme low water line would constitute an unconstitutional taking of private property. *Id.* at 689–92, 313 N.E.2d at 568–69.

The Maine common law rules defining the property interests in intertidal land come from the same Colonial Ordinance source as the Massachusetts common law rules on that subject, and the Maine case development on the subject has in no significant respect departed from that in Massachusetts. The public need for access along the seashore was certainly as strong in Massachusetts in 1974 as in Maine today. In these circumstances, the three unanimous Massachusetts opinions, addressing the precise issue here raised in Maine for the first time, are persuasive precedent in the case at bar.

A public easement for bathing, sunbathing, and recreational walking cannot be justified on the factual assumption that it is "no more burdensome" on the private landowner than the Colonial Ordinance easement for fishing, fowling, and navigation. To justify adding a further easement on the ground it is "no more burdensome" is on its face self-contradictory. No one suggests or could suggest that any such public easement for bathing, sunbathing, and recreational walking is to be substituted for the ancient easement. Fishing, fowling, and navigation remain important uses of the Maine coast. If the private landowner now has ten fishermen, fowlers, and boaters using his land, adding ten bathers, sunbathers, and walkers obviously

---

18. Much earlier in Maine we had held that the lands of the oceanfront owner may be increased by natural accretion. *See King v. Young,* 76 Me. 76 (1884).

makes the aggregate public easement more *burdensome. Furthermore, one* would expect that a direct comparison of the magnitude of the relative burdens would show that at Moody Beach a substitution of bathers, sunbathers, and walkers for the fishermen, fowlers, and boaters using the beach would in fact result in a much greater burden upon the fee owner.

A court would have other difficulties as well with declaring a public easement for bathing, sunbathing, and recreational walking on the privately owned intertidal land. On the one hand, those uses fall considerably short of the comprehensive recreational use the Town of Wells urges as the scope of the modern public need, and also considerably short of the routine uses to which public beaches are put. We can find no principled basis for allowing bathing, sunbathing, and walking on privately owned intertidal land, and not allowing picnics and frisbee-throwing and the many other activities people regularly engage in on the beach. But there is no basis in law or history for declaring a public easement for general recreation. That would turn the intertidal zone of Moody Beach into a public recreational area indistinguishable from the adjacent Ogunquit Beach, which the Village of Ogunquit acquired in its entirety by eminent domain.

The foregoing considerations demonstrate why a court cannot extend a public easement in the privately owned intertidal land beyond that reserved in the Colonial Ordinance and defined by over 340 years of history. To declare a general recreational easement, the court would be engaging in legislating, and it would do so without the benefit of having had the political processes define the nature and extent of the public need. It would also do so completely free of the practical constraints imposed on the legislative branch of government by the necessity of its raising the money to pay for any easement taken from private landowners. The objectives of the Town of Wells are better achieved by a public tak-

ing of a *public* easement tailored to its *specific* public need.

Thus, as we have seen, the legal regime governing the ownership of intertidal land was firmly established in the District of Maine prior to Statehood. It had been so declared in 1810 by the Massachusetts Supreme Judicial Court in a case involving intertidal land in Cape Elizabeth. *Storer v. Freeman,* 6 Mass. 435. As previously noted, in 1820 the Maine Constitution both confirmed the grant of the intertidal land in fee to the upland owners and took over as the law of Maine the reserved public easement limited to fishing, fowling, and navigation. *See* Me. Const. art. X, §§ 3, 5. Over a century ago, this court emphatically rejected the argument "that the court may change [that legal regime] if satisfied that it does not operate beneficially under present circumstances." *Barrows v. McDermott,* 73 Me. at 449. The judicial branch is bound, just as much as the legislative branch, by the constitutional prohibition against the taking of private property for public use without compensation.

## II.

### *The Public Trust in Intertidal Land Act Constitutes an Unconstitutional Taking*

The legislature, by enacting in 1986 the Public Trust in Intertidal Land Act, 12 M.R.S.A. §§ 571–573, declared that "the intertidal lands of the State are impressed with a public trust," *id.* § 571, and that those rights of the public include a "right to use intertidal land for recreation," *id.* § 573(1)(B).[19] The legislature thus imposed upon all intertidal land (defined by the Act in accordance with the Colonial Ordinance) an easement for use by the general public for "recreation" without limitation. The Superior Court held the Public Trust in Intertidal Land Act unconstitutional as a violation of the separation of powers provision of the Maine Constitution, art. III. We do not reach the separation of powers question because the Act takes for public

---

[19]. The Public Trust in Intertidal Land Act was enacted in early 1986 at a time when *Bell I,* 510 A.2d 509, was still pending in this court but at a

time too late for the Act to be an issue in that first appeal. *See* n. 8 above.

use much greater rights in the intertidal zone than are reserved by the common law and therefore the Act on its face constitutes an unconstitutional taking of private property. We agree therefore with the Superior Court that the Act is unconstitutional, but we ground our holding on the violation of the Takings Clauses of both the Maine and the United States Constitutions. *See* Me. Const. art. I, § 21; U.S. Const. amend. V.

The Public Trust in Intertidal Land Act in creating a public easement for "recreation" leaves that term both undefined and unlimited—with the sole exceptions that the public recreation may not interfere with any structure or improvement lawfully maintained on intertidal land, nor may motorized vehicles other than watercraft be used there unless authorized by the State or municipality. *See* 12 M.R.S.A. § 573(2)(B), (D). The very nature of those exceptions emphasizes the all-inclusive recreational easement created by the Act over intertidal land owned in fee by the upland property holders. By its use of the unqualified term "recreation," the Act permits both individual and organized recreation of any form and nature. Members of the public in unrestricted numbers are thus given the right to come on this private property, not only for bathing, sunbathing, and walking as general recreation, but also for any other recreational activity whatever including, for example, ball games and athletic competitions, camping for extended hours, operation of vehicles (including even ATVs and other motorized vehicles, with State or municipal authorization), nighttime beach parties, and horseback riding. This comprehensive easement for public recreation sharply differs in nature and magnitude from the easement for fishing, fowling, and navigation and related uses that the common law alone reserved in favor of the public out of the fee ownership of intertidal land it at the same time vested in the upland owners. The Act thus constitutes a taking of private property for a public use. Since the Act provides no compensation for the landowners whose property is burdened by the general recreational easement taken for public use, it violates the prohibition contained in both our State and Federal Constitutions against the taking of private property for public use without just compensation.

Our analysis and conclusion are the same under both Constitutions. Long ago this court said:

> [The Takings Clause] was designed to operate and it does operate to prevent the acquisition of any title to land *or to an easement in it* or to a permanent appropriation of it, from an owner for public use, without the actual payment or tender of a just compensation for it.

*Cushman v. Smith,* 34 Me. 247, 265 (1852) (emphasis added). In their 1974 *Opinion of the Justices* already discussed above, the justices of the Massachusetts court have already answered the very question now before us. 365 Mass. 681, 313 N.E.2d 561. They declared that a proposed statute merely to create a public footpath along the intertidal zone, a much more limited and less intrusive public easement than that taken by the Maine Act, would constitute an unconstitutional taking of property from the owners of the fee. The Massachusetts justices' reasoning has precise relevance to the case at bar:

> The elusive border between the police power of the State and the prohibition against taking of property without compensation has been the subject of extensive litigation and commentary. See Bosselman, Callies & Banta, The Taking Issue (1973). But these difficulties need not concern us here. The permanent physical intrusion into the property of private persons, which the bill would establish, is a taking of property within even the most narrow construction of that phrase possible under the Constitutions of the Commonwealth and of the United States.
>
> It is true that the bill does not completely deprive private owners of all use of their seashore property in the sense that a formal taking does. But the case is readily distinguishable from such regulation as merely prohibits some particular use or uses which are harmful to the public. See *Commonwealth v. Alger,* 7

Cush. 53, 86 (1851). The interference with private property here involves a wholesale denial of an owner's right to exclude the public. If a possessory interest in real property has any meaning at all it must include the general right to exclude others. Nichols, Eminent Domain (Rev. 3d ed.) § 5.1[1] (1970).

*Id.*, 365 Mass. at 689, 313 N.E.2d at 568.

The public recreational easement taken by the Maine Act over oceanfront owners' land must be distinguished from the governmental action regulating private land use that we have in recent years examined under the Takings Clause. *See, e.g., Hall v. Board of Envtl. Protection*, 528 A.2d 453 (Me.1987) (restriction on building on sand dunes); *Curtis v. Main*, 482 A.2d 1253, 1258 (Me.1984) (zoning restrictions); *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 482–83 (Me.1982) (restriction on timber harvesting). In those cases of "regulatory taking" we make "a factual inquiry into the substantiality of the diminution in value of the property involved." *Id.* at 482. That analysis becomes inappropriate, however, when the issue before us is the constitutionality of a statute that authorizes a physical invasion of private property.[20] As one scholar has written:

> The modern significance of physical occupation is that courts, while they sometimes do hold nontrespassory injuries compensable, *never* deny compensation for a physical takeover.

Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv.L.Rev. 1165, 1184 (1967) (emphasis in original). In *Nollan v. California Coastal*

*Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), where California had conditioned a seaside building permit upon the private owners' "mak[ing] an easement across their beachfront available to the public on a permanent basis," the Court found an unconstitutional taking, however slight the adverse economic impact on the owners, saying:

> We think a "permanent physical occupation" has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.

*Id.* at 832, 107 S.Ct. at 3145, 97 L.Ed.2d at 686. *See also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (invalidating New York law prohibiting landlord from interfering with cable television facilities placed on his premises); *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (denying federal government's claim of public's right to navigate into a private pond opened to the sea by its owner in creating a marina).

The fact that the common law already has reserved to the public an easement in intertidal land for fishing, fowling, and navigation, and for related uses (even though the specific objects of that easement may be pursued for recreation as well as sustenance and profit) does not mean that the State can, without paying compensation to the private landowners, take in addition a public easement for general recreation.[21] *See Opinion of the Justices,*

---

**20.** The Town of Wells argues further that we should not ask whether there has been a taking of the intertidal zone, but whether the statutory attempt to enlarge the public easement would be a taking relative to the upland owner's property as a whole. The Town would be correct if no separable interest in the intertidal zone were affected, but that is not the case. If a municipality, for example, imposes setback restrictions, whether there is a taking depends on the impact on the lot as a whole of the regulatory regime in the neighborhood as a whole. But if the municipality then commences to use all or part of that setback as a public way, the taking involves the specific land burdened by the easement.

**21.** The principle that a state, under the guise of interpreting its common law, cannot sanction a physical invasion of the property of another, is in no way vitiated by the Supreme Court's holding in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), that the California Supreme Court's construction of the California Constitution's free speech clause did not perpetrate a taking. The California court had held that individuals seeking to distribute pamphlets in a privately owned shop-

365 Mass. 681, 313 N.E.2d 561. The common law has reserved to the public only a limited easement; the Public Trust in Intertidal Land Act takes a comprehensive easement for "recreation" without limitation. The absence of any compensation to the fee owners renders the Act unconstitutional.

## III.

*The Town of Wells Has Failed to Prove a Public Easement Has Been Established by Local Custom in the Dry Sand Area or the Intertidal Land at Moody Beach*

■ The Superior Court rejected all contentions that the public has acquired rights in Moody Beach by prescription, implied dedication, or local custom. The Town of Wells does not contest the court's prescription and dedication findings, but it does appeal the court's finding that the evidence adduced at trial fails to prove public recreational rights established in Moody Beach by local custom. We affirm the judgments of the Superior Court, but we do not find it necessary to decide whether the court was correct in holding that under the common law of Maine the public may acquire by local custom an easement over privately owned land. Very few American states recognize the English doctrine of public easements by local custom. *See* 3 *Powell on Real Property* ¶ 414[9] (1986 & Supp. 1988). The Maine case that discusses such easements in some detail, *Piper v. Voorhees*, 130 Me. 305, 311, 155 A. 556, 559 (1931), cites with approval the leading Connecticut case rejecting the doctrine, *Graham v. Walker*, 78 Conn. 130, 133–34, 61 A. 98, 99 (1905). That latter case had held:

[W]e are of opinion that such rules of the English common law as gave [easements by local custom] sanction were unadapted to the conditions of political society existing here, and have never been in force in Connecticut.

The inclusion of "custom" in 14 M.R.S.A. §§ 812 and 812–A (1980), providing a means for preventing the acquisition of easements by "custom, use or otherwise," is explainable as merely a legislative exercise in overabundant caution. There is a serious question whether application of the local custom doctrine to conditions prevailing in Maine near the end of the 20th century is necessarily consistent with the desired stability and certainty of real estate titles.

In any event the Superior Court's acceptance of the doctrine of local custom was not essential to its ultimate decision. That decision was adequately founded, without more, on its finding that the Town of Wells had failed to prove at least two factual predicates usually required for application of the local custom doctrine, namely, the public usage must have occurred "so long as the memory of man runneth not to the contrary" and it must have been peaceable and free from dispute. The Town, which bears the burden of proof on the claim of a public easement by local custom, can point to no evidence in this record that compelled the Superior Court to find that those two factual predicates are met. In these circumstances the Town of Wells cannot prevail on appeal from the trial court's adverse findings. *See Luce Co. v. Hoefler*, 464 A.2d 213, 215 (Me.1983). Thus, the Town of Wells takes nothing on its local custom argument, even assuming the public may acquire an easement by that means in this State.

ping center continued to enjoy "public forum" access rights under the state constitution even though the public forum doctrine under the First Amendment enunciated in *Amalgamated Food Employees v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), had been curtailed by *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). Quoting the California court, the Supreme Court in *PruneYard* stated: "It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced [by the commercial property owner] to congregate daily...." 447 U.S. at 78, 100 S.Ct. at 2039. The decision affirmed in *PruneYard* granted no easement or other inherent right of access to the public or to any individual; it merely regulated the terms under which the property owner could lawfully permit selective public access.

## Conclusion

As development pressures on Maine's real estate continue, the public will increasingly seek shorefront recreational opportunities of the 20th and 21st century variety, not limited to fishing, fowling, and navigation. No one can be unsympathetic to the goal of providing such opportunities to everyone, not just to those fortunate enough to own shore frontage. The solution under our constitutional system, however, is for the State or municipalities to purchase the needed property rights or obtain them by eminent domain through the payment of just compensation, not to take them without compensation through legislative or judicial decree redefining the scope of private property rights. Here, whatever various visitors to Moody Beach may have thought, the state of the title to the intertidal land was never in any doubt under the Maine Constitution and relevant case law, and owners, occupiers, buyers, and sellers of shorefront land were entitled to rely upon their property rights as so defined. In the absence of State regulation to the extent permitted by the police power, that is the meaning of our constitutional prohibitions against the taking of private property without just compensation.

The entry is: judgments affirmed.

GLASSMAN, HORNBY and COLLINS, JJ. concur.

WATHEN, Justice, with whom ROBERTS and CLIFFORD, Justices, join, dissenting.

I do not agree that public recreational rights in the Maine coast are confined strictly to "fishing," "fowling," and "navigation", however "sympathetically generous" the interpretation of those terms might be. The Court concludes that the shoreowners have the unrestricted right to exclude any member of the public from the intertidal lands unless that person is engaged in fishing, fowling or navigation. That conclusion is premised upon the erroneous assumption that the Colonial Ordinance is the exclusive and preeminent source of all public rights. In fact, public rights in the intertidal lands existed at common law, long before the Ordinance.[1] Those common law rights were not displaced by the Ordinance and are broad enough to permit the activities described in the Public Trust in Intertidal Land Act. Because I interpret the common law right of use more flexibly and expansively than the Court does, I would vacate the judgment and uphold the constitutionality of the Act on the basis that it merely confirms recreational rights existing as a matter of common law.

Any attempt to fairly and justly resolve this important controversy is made more difficult by the need for an accurate and faithful reconstruction of the relevant aspects of more than 300 years of human activity and common law development. Rarely is there such a gap in the development of the law that a court confronts a significant issue of first impression concerning an ordinance enacted as long ago as 1641. My review of the relevant history, both social and legal, persuades me that the opinion of the Court does not accurate-

---

1. In this regard the Superior Court made the following findings of historical fact:

    The framers [of the Colonial Ordinance] did not intend fishing, fowling and navigation to exclude other public rights in the intertidal zone that might have existed prior to 1648. For example, the poor roads in 17th Century Colonial America and the dangers that existed in trying to travel inland, both before and after passage of the Colonial Ordinance, made travel along the intertidal zone a public right on both public and private intertidal zones. *Testimony of Professors Konig and Barnes and Defendants' Exhibits 35, 44 and 86.* The Laws and Liberties expressly discussed the right of drovers to rest cattle in open areas. *Barnes,* *The Laws and Liberties of Massachusetts* (1982) at p. 18. Other historical documentary evidence makes it clear that the public could use the beaches for their own travel and for driving cattle. This right by necessity and usage apparently did not survive long enough to be formally approved by the courts as a common law right but there can be no doubt that it was a public right in 1648 and for many years thereafter. The framers also expected that public rights by custom could develop and be part of the law subsequent to passage of the 1648 Laws and Liberties, so long as they were not immoral. *Barnes* at p. 45.

ly define the public's right to use the Maine shore.

With the advantage of hindsight, it is now established beyond doubt that the determination of public and private rights in the intertidal land is fundamentally a matter of state law. This conclusion derives from the prevailing interpretation of the English common law regarding ownership of the intertidal lands.[2] Under that interpretation, the king held title to all the lands below the high water mark which were affected by the ebb and flow of the tides. *E.g., Shively v. Bowlby*, 152 U.S. 1, 11, 14 S.Ct. 548, 552, 38 L.Ed. 331 (1894); *Bell v. Wells*, 510 A.2d 509, 511 (Me.1986); *Barker v. Bates*, 30 Mass. 255, 259 (1832); *Blundell v. Catterall*, 106 Eng.Rep. 1190, 1193 (1821). The king's ownership of those lands was qualified. The lands were thought "incapable of ordinary and private occupation, cultivation and improvement" and more appropriately devoted to public uses such as navigation, commerce, and fishing. *Shively v. Bowlby*, 152 U.S. at 11, 14 S.Ct. at 552. The king's ownership of the intertidal lands was therefore of two types. He held the title, or *jus privatum*, absolutely. As sovereign he also held the public rights or *jus publicum* in trust for the benefit of the public. *Id.* Although the king possessed the power to convey the lands below the high water mark, any conveyance to a private individual was subject to the *jus publicum*. *Id.* at 13, 14 S.Ct. at 552.[3] Following the American Revolution, "the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Martin v. Lessee of Waddell*, 41 U.S. (16 Pet.) 367, 410, 10 L.Ed. 997 (1842). In a recent case, the Supreme Court of the United States restated the principle and held that the original thirteen states and all new states, upon entering the union, acquired title to all lands under waters subject to the ebb and flow of the tides. *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 108 S.Ct. 791, 794–95, 98 L.Ed.2d 877 (1988). As sovereign, those states, like the king hold the intertidal lands in trust for the public. *E.g. Phillips Petroleum Co. v. Mississippi*, 108 S.Ct. at 794; *Shively v. Bowlby*, 152 U.S. at 57, 14 S.Ct. at 569.

It is now certain that unless the common law has been modified, ownership of the intertidal lands lies in the state. It is also established "that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see

**2.** The English interpretation is in turn based upon an ancient Roman concept of "natural law" holding that some things, including the shores, by their nature are common to all.

> Things common to mankind by the law of nature, are the air, running water, the sea, and consequently the shores of the sea; no man therefore is prohibited from approaching any part of the seashore, whilst he abstains from damaging farms, monuments, edifices, etc. which are not in common as the sea is.

Inst. 2.1.1; *See also* Butler, *The Commons Concept: An Historical Concept with Modern Relevance*, 23 Wm. & Mary L.Rev. 835, 849 (1982); Comment, *The Public Trust Doctrine in Maine's Submerged Lands: Public Rights, State Obligation and the Role of the Courts*, 37 Me.L.Rev. 105, 107–08 (1985).

**3.** In *Bell v. Wells*, 510 A.2d 509, 511 n. 5 (Me. 1986), this Court noted the existence of a contrary view regarding the ownership of the intertidal zone in medieval England. Under that view, the owner of the adjoining upland had acquired title to the intertidal zone subject to certain public rights. *See e.g.* Comment, *Coastal Recreation: Legal Methods for Securing Public Rights in the Seashore*, 33 Me.L.Rev. 69, 73–77 (1981). The writings of Lord Chief Justice Hale, a noted jurist of the 17th Century, support, however, the theory that the king presumptively held title to the intertidal zone but that private ownership of those lands was possible at common law.

> The shore is that ground that is between the ordinary high-water mark and low-water mark. This doth *prima facie* and of common right belong to the king, both in the shore of the sea and the shore of the arms of the sea.
>
> . . . . .
>
> . . . Although it is true, that such shore may and commonly is parcel of the manor adjacent, and so may be belonging to a subject . . . yet *prima facie* it is the king's.

Hale, *De Jure Maris*, ch. 4 *reprinted in A Collection of Tracts Relative to the Law of England from Manuscripts* 12–13 (F.Hargrave 1st ed. 1787).

fit." *Phillips* 108 S.Ct. at 794. The Massachusetts Bay Colony altered the common law regarding sovereign ownership by the enactment of a Colonial Ordinance and the subseqeunt adoption of that Ordinance as part of the common law. Maine entered the Union as part of the State of Massachusetts and, after achieving independent statehood purported to adopt the Massachusetts usage as part of the common law of Maine. The issue thus becomes: What change in the common law rights of the public has been wrought by the scheme of private ownership that arose from the Colonial Ordinance and the customary law resulting from that Ordinance?

## Enactment of Colonial Ordinance

In 1620 James I, King of England, granted to the Council of Plymouth "for the planting, ruling, ordering, and governing of Newe England in America ... all the Firme Landes, Soyles, Groundes, Havens, Portes, Rivers, Waters, Fishing ...." The Charter of the Massachusetts Bay (March 4, 1629), *reprinted in* R. Perry, *Sources of our Liberties* 82 (1960) (reciting prior grant by James I). This grant was confirmed and reiterated eight years later by Charles I in the Charter of Massachusetts Bay and embraced the whole of New England. *Hill v. Lord*, 48 Me. 83, 92 (1861). The Charter empowered the officers of the Massachusetts Bay Company "to make Lawes and Ordinnces (sic) for the Good and Welfare of the saide Company ...." R. Perry, *Sources of our Liberties* at 89. On the basis of the authority so conferred, the General Court appointed a committee to prepare a draft of laws to place a limitation on the discretionary power of the magistrates. *Id.* at 143–44. As a concession to the magistrates who vigorously resisted the enactment of laws, it was agreed that the initial set of laws would remain in force for three years only. *Id.* at 145–46. The Body of Liberties of 1641 was enacted on that temporary basis. Section 16 of the Body of Liberties, the predecessor of the Colonial Ordinance, gave to all inhabitants

the right of free fishing and fowling. Section 16 provided:

> Every Inhabitant that is an howse holder shall have free fishing and fowling in any great ponds and Bayes, Coves and Rivers, so farre as the sea ebbes and flowes within the presincts of the towne where they dwell, unlesse the free men of the same Towne or the Generall Court have otherwise appropriated them, provided that this shall not be extended to give leave to any man to come upon others proprietie without there leave.

Massachusetts Body of Liberties § 16 (December 10, 1641), *reprinted in* R. Perry at 148, 150.[4] Six years later, the Body of Liberties was amended and made more comprehensive. Section 2 of the "Liberties Common" replaced Section 16 and provided as follows:

> Everie Inhabitant who is an hous-holder shall have free fishing and fowling, in any great Ponds, Bayes, Coves and Rivers so far as the Sea ebbs and flows, within the precincts of the town where they dwell, unles the Free-men of the same town, or the General Court have otherwise appropriated them. Provided that no town shall appropriate to any particular person or persons, any great Pond conteining more then ten acres of land: and that no man shall come upon anothers proprietie without their leave otherwise then as heerafter expressed; the which clearly to determin, it is declared that in all creeks, coves, and other places, about and upon salt water where the Sea ebbs and flows, the Proprietor of the land adjoyning shall have propriete to the low water mark where the Sea doth not ebb above a hundred rods, and not more wheresoever it ebs farther. Provided that such Proprietor shall not by this libertie have power to stop or hinder the passage of boats or other vessels in, or through any sea creeks, or coves to other mens houses or lands. And for great Ponds lying in common though within the bounds of some town, it shall be free for any man to fish and fowl there, and may passe and repasse

---

4. It is significant to note that the liberty to use great ponds constituted a clear departure from

English law. *Conant v. Jordan,* 107 Me. 227, 230, 77 A. 938, 939 (1910).

on foot through any mans propriete for that end, so they trespasse not upon any mans corn or meadow. [1641–1647]

Liberties Common § 2, *The Book of the General Lawes and Libertyes Concerning the Inhabitants of Massachusetts* (Boston, Mass.1647) *(facsimile reprint in* 1 D. Cushing, *The Laws and Liberties of Massachusetts 1641–1691* at 41, 1976). Section 2 of the Liberties Common has come to be known as the Colonial Ordinance. It grants "propriete" to the adjoining upland owner to the low watermark of tidal waters, not to exceed 100 rods. The Ordinance in terms reserves to inhabitants the right of free fishing and fowling. It provides further that the fee title of the upland owner in the intertidal lands does not give him the right to "hinder the passage of boats or other vessels." *Id.* The courts have construed this clause as a reservation to the public of the right of navigation. *See e.g., Bell v. Wells,* 510 A.2d 509, 515 (Me.1986).

*The Reception of the Principles of the Ordinance into the Common Law of Maine*

The District of Maine did not become part of the Massachusetts Bay Colony until 1692. By its terms, the Ordinance did not apply to the territory that is now Maine, nor did the legislative body responsible for its enactment have governing authority over that territory. Moreover, prior to the separation of Maine from Massachusetts the Ordinance "was annulled with the charter by the authority of which it was made." *Storer v. Freeman,* 6 Mass. 435, 438 (1810). Ten years before Maine's separation, however, the private ownership created by the ordinance was declared part of the common law of Massachusetts. "[A]n usage has prevailed, which now has force

as our common law, that the owner of lands bounded on the sea or salt water shall hold to low water mark, so that he does not hold more than one hundred rods below high water mark." *Id.*[5]

Relying on the prevailing usage referred to in *Storer v. Freeman,* this Court had held for over 150 years that the Colonial Ordinance is a part of Maine common law. In *Lapish v. Bangor Bank,* 8 Me. 85 (1831), the issue was whether a deed conveying lands along the Penobscot conveyed the intertidal lands as well as the upland. This Court rejected the argument that the Colonial Ordinance was not applicable either by enactment, construction or adoption. "Ever since [*Storer v. Freeman* ], as well as long before, the law on this point has been considered as perfectly at rest; and we do not feel ourselves at liberty to discuss it as an open question. We deem the usage in question as applicable to ... this species of property." *Id.* at 93. Fifty-one years later, in *Barrows v. McDermott,* 73 Me. 441 (1882), the plaintiff argued that the Ordinance did not apply to lands situated within the ancient Acadia. We acknowledged that the Ordinance did not extend to Maine by its terms but we regarded the Ordinance as part of the common law of Maine by virtue of public acceptance and usage. We described the precise method of adoption in the following terms:

> It [the Ordinance] is not adopted solely at the discretion of the court declaring its adoption, but because the court find (sic) that it has been so largely accepted and acted on by the community as law that it would be fraught with mischief to set it aside.

*Id.* at 448. Although not explicitly noted, we relied upon the two elements classically

---

**5.** Shortly after Maine's separation from Massachusetts, the Supreme Court of Massachusetts held that the Colonial Ordinance applied to the colony of Plymouth despite the fact that as a positive legislative enactment the ordinance never embraced that area. *Barker v. Bates,* 30 Mass. 255, 258 (1832).

> But though the rule in question cannot be traced to this source, as a rule of positive law, we are of opinion that it is still a settled rule of property in every part of the State and

founded upon a basis quite as firm and immovable; that being a settled rule of property, it would be extremely injurious to the stability of titles, and to the peace and interest of the community, to have it seriously drawn in question. It is founded upon a usage and practice so ancient, immemorial and unvarying, that without tracing its precise origin, it must now be deemed a rule of common law proved by such usage.

*Id.*

considered essential for the legal recognition of custom, namely, long-continuing usage and tacit consent or general agreement. *See* Schiller *Custom in Classical Roman Law*, 24 Va.L.Rev. 268, 272 (1937–1938). Stated accurately, Maine did not adopt the Ordinance but rather fashioned the law from the custom and usage that grew out of the Ordinance.[6] Although such a clear example of law developed from custom and usage is rare, the jurisprudential concept is of ancient origin. Julian, a classical jurist of the highest prestige describes the use of custom as a source of Roman law in the classical era (roughly 150 B.C. to 235 A.D.):

> Immemorial custom is properly preserved as law and this is the law that is said to have been enacted by usage. For since statutes bind us for no other reason than that they have been received by the opinion of the people, properly also those things which the people have approved without any writing at all will bind all; for what does it matter whether the people declares its will by vote or by circumstances and conduct? Wherefore even this principle is most rightly received that statutes are abrogated not only by vote of the legislator but also by the tacit consent of all through desuetude.[7]

J. Dawson, *The Oracles of the Law* 128 (1968) (quoting Dig. 1.3.32 (Julianus, Dig. 94)). I conclude that the source of the law of private ownership of the Maine shore is this Court's recognition of usage and public acceptance. No deed of transfer or legislative grant created the existing scheme of private ownership, but rather the plaintiffs' ownership is derived exclusively from customary law. The public rights, on the other hand, existed at common law and predated the Ordinance and the custom of private ownership.[8] Accordingly, disputes con-

---

6. In a case involving that provision of the Ordinance dealing with "great ponds" this Court noted that the principles of the Ordinance were recognized and practiced in Maine as a matter of custom even before the second Massachusetts Bay Charter of 1691 brought the District of Maine under the political control of Massachusetts.

> The same conditions which led the people of Massachusetts to declare "free fowling and fishing" as one of their "liberties" existed here. There was the same necessity for a resort to fishing and fowling for sustenance. In both cases, the colonists were in a comparatively uninhabited and not very fertile country. It was a wilderness. They gained only a scanty subsistence from the soil. Husbandry was attended with failure of crops and depredations from savage foes. The common law of England, which restricted the use of ponds and streams to private owners was not suited to their conditions and necessities. It is commonly said that the common law of England was brought over by the colonists and, in a general sense became their law, but it is held that they adopted only so much of it as was suitable to their new conditions and needs, consistent with the new state of society, and conformable to the general course of policy which they intended to pursue.

*Conant v. Jordan*, 107 Me. 227, 234, 77 A. 938, 940 (1910). At an earlier point in the opinion, we described the process of adoption in the following words:

> It has been judicially adopted, not in the sense that the Court extended it to this State, but that the Court found it extended by the public itself, as the expression of a public right, so

acted upon and acquiesced in as to have become a settled, universal right.

*Id.* at 230, 77 A.2d at 939. *See also* Comment, *Maine's Reception of the Common Law*, 30 Me. L.Rev. 274, 283–84 (1979).

7. There is considerable debate among scholars whether custom was accepted as an independent source of law during the classical era and whether custom could abrogate a statute. There are some who contend that such notions of customary law arose during the post-classical period. *See* Schiller, *Custom in Classical Roman Law*, 24 Va.L.Rev. 268 (1938).

8. For a discussion of the source of public rights *see* Waite, *Public Rights in Maine Waters*, 17 Me.L.Rev. 161, 172 (1965). It is interesting to note that the sovereign ownership and the public rights in "great ponds", both being unknown at common law, are derived solely from the customary law growing out of the Ordinance. *Id.* The distinction between custom and the common law has been aptly described as follows:

> First, every custom is in some fundamental respect an *exception* from the ordinary law of the land.
>
> Second, every custom is *limited* in its application. It does not apply to the generality of citizens, but only to a particular *class* of persons or to a particular *place*. Although it must always govern a plurality of persons—for there is no such thing as a custom inherent only in one person—the plurality must be restricted.
>
> These two rules really amount to stating the same proposition in two different ways. A

cerning previously undefined attributes of public rights and private ownership should be resolved by resort to the original sources, the common law and custom. As illustrated by the process of adopting the Colonial Ordinance in Maine, custom is an unwieldy source of law. Obvious difficulties are involved in documenting and proving the dynamic process of public usage and acceptance. Even once established, however, custom is rarely sufficiently comprehensive to resolve all areas of conflict and dispute. The present case is no exception.

*Private ownership and evolving concepts of public rights.*

The "grant of land" occasioned by the Ordinance was designed to promote commerce by encouraging the construction of wharves at private expense. "To induce persons to erect them, the common law of *England* was altered by an ordinance, providing that the proprietor of land adjoining on the sea or salt water, shall hold to lower water mark ...." *Storer v. Freeman*, 6 Mass. 435, 438 (1810) (emphasis in the original). *Accord, e.g., Commonwealth v. Charleston*, 18 Mass. (1 Pick.) 180, 183 (1822). Notwithstanding that limited purpose, this Court has followed the lead of Massachusetts in describing the rights of the riparian owner expansively in terms of fee simple ownership. *See, e.g., Bell v. Wells*, 510 A.2d 509, 515 (Me.1986). Chief Justice Shaw emphasized the substantial

nature of the owner's interest in *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851), one of the leading cases construing the ordinance. According to that court, the ordinance "imports not an easement, an incorporeal right, license, or privilege, but a *jus in re*, a real or proprietary title to, and interest in, the soil itself, in contradistinction to a usufruct, or an uncertain and precarious interest." *Id.* at 70. Moreover, the fee holder could use traditional forms of action against persons who attempted to interfere with his rights of ownership. "[H]e may maintain trespass for unlawful entry thereon, or trespass on the case for obstructing his rights of fishery, or a writ of entry against a disseizor ...." *Marshall v. Walker*, 93 Me. 532, 537, 45 A. 497, 498 (1900). Subject to the rights of fishing, fowling, and navigation expressly reserved to the public in the ordinance, the riparian owner's "title to the shore [is] as ample as to the upland ...." *State v. Wilson*, 42 Me. 9, 28 (1856).[9]

The substantial nature of the interest accorded to the littoral owner is illustrated by this Court's decision in *Sawyer v. Beal*, 97 Me. 356, 54 A. 848 (1903). In that case, the plaintiff, littoral owner brought suit to recover a statutorily prescribed penalty under R.S. ch. 3, § 63 (1885). That statute prohibited the erection of fish weirs or wharves in tide water "in front of the shore or flats" of the riparian owner.[10]

custom applying to all the Queen's subjects is not truly a custom at all in the legal sense, for, as Coke says, 'that is the common law'. C. Allen, *Law in the Making* 130 (7th ed.1964) (emphasis in the original).

**9.** In *Wilson*, the defendant riparian owner erected a wharf between high and low water marks on the shore of the Penobscot River. The indictment charged him with construction of a nuisance and consequent obstruction of an ancient ferry landing place. Defendant's conviction was reversed even though his construction of the wharf impeded the free passage of boats, within his sphere of ownership. This Court explained:

[I]t has never been held, that such proprietor has been precluded from erecting wharves and piers upon his own flats, notwithstanding it would prevent the free passage of vessels and boats, so far as the ground was so cover-

ed, provided he did not encroach upon the public domain, in materially interrupting the general navigation.
*State v. Wilson*, 42 Me. at 26.

**10.** Although the Ordinance expressly reserved the right of fishing in the public, this Court did not construe it to permit him to place fish weirs on the privately owned flats. The riparian owner, on the other hand, did have the right to do so. This distinction effectually secured to the riparian owner superior rights of fishing. In *Duncan v. Sylvester*, 24 Me. 482, 486 (1844), this Court acknowledged: "These are advantages often of great value, which the riparian proprietor has over others. Having a common right with others to fish in those waters, he may, without any unreasonable exercise of that right, or improper interference with the rights of others, avail himself of these superior advantages." *Id.* Forty years later in *Matthews v. Treat*, 75 Me. 594 (1884), this Court again reiterated the privi-

The precise issue was the construction of the phrase "in front of the shore or flats." The Court analyzed the issue with reference to the purpose of the statute which was to protect the rights of the littoral owner and concluded that the statute prohibited fish weirs which were "so near the shore of another as to injure or injuriously affect the latter in the enjoyment of his rights as such owner ...." *Id.* at 358, 54 A. at 848. The Court stressed the fact that the statute created no new rights in the owner. Rather its purpose was to "extend to him additional protection" in the enjoyment of his existing rights, and to provide him with a means of redressing non trespassory interferences with the "use and enjoyment of his land." *Id.,* 54 A. at 848. In this case we described the right of the littoral owner as follows: "Within the limits of his ownership he has all the exclusive rights of an owner." *Id.,* 97 Me. at 358, 54 A. at 848.

In *Marshall v. Walker,* 93 Me. 532, 45 A. 497 (1900), we suggested that the owner of the flats might appropriate the flats to himself by building on them or filling them and thereby cut off public rights provided only that navigation is not unreasonably impaired by this action.

> [The] ordinance has become a part of our common law, and by it, the proprietor of the main holds the shore to low water not exceeding one hundred rods. *He holds it in fee, like other lands,* subject, however, to the jus publicum, the right of the public to use it for the purposes of navigation and fishery, not, however, to interfere with his right of exclusive appropriation that shall not unreasonably impede navigation by filling and turning it into upland, or by building wharves or other structures upon it, so that necessarily the public would be excluded thereby.

*Id.* at 536, 45 A. at 498 (emphasis added). In addition, we have held that the lands of the riparian owner may be increased by natural accretion. *King v. Young,* 76 Me. 76 (1884), and that he may convey the flats yet retain the upland or *vice versa,* or convey both separately. *E.g. Snow v. Mount Desert Island Real Estate Co.,* 84 Me. 14, 18, 24 A. 429, 430 (1891).

Looking at the other side of the ledger, we have consistently characterized the public's interest as an easement. *E.g., Bell v. Wells,* 510 A.2d 509, 516–17 (Me.1986). It is true, however, that it is an easement that has undergone significant change since its inclusion in the Ordinance. By its terms the Ordinance extended the liberties of fishing and fowling only to inhabitants who were householders. Perhaps as a result of the preexisting common law or a recognition of contrary usage the early opinions of this Court described the liberties as a public right. *See e.g., Barrows v. McDermott,* 73 Me. 441, 449 (1882). Although the liberties secured by the Ordinance grew out of the necessity to provide sustenance, they were soon expanded to include recreational fishing and fowling. In 1882, this Court acknowledged the possibility that the liberties were "now chiefly exercised by pleasure seekers and idle tramps who might be more profitably employed ...." *Id.* Moreover, the public's easement for fishing has expanded to include activities such as digging for worms, *State v. Lemar,* 147 Me. 405, 87 A.2d 886 (1952), digging for shellfish, *Moulton v. Libbey,* 37 Me. 472 (1854), and digging for clams. *State v. Leavitt,* 105 Me. 76, 72 A. 875 (1909).[11] The public rights of navigation now include the right to use the waters as a public highway even when frozen, *French v. Camp,* 18 Me. 433 (1841), and include travel for recreational purposes. *E.g. Smart v. Aroostook Lumber Co.,* 103 Me. 37, 68 A. 527 (1907).

---

leged position of the riparian owner, even with regard to rights also held by the public.

> This private ownership must necessarily give to the proprietor some privileges which do not belong to the public. Among others is the right of erecting fixtures thereon or attaching them to the shores. Hence while the proprietor of the flats may fasten his seine by grap-

pling to the shore and erect weirs for the purpose of catching fish, those having public rights only cannot do so.

*Id.* at 598.

11. *Lemar, Moulton,* and *Leavitt* in fact all dealt with the authority of the State to regulate the various public rights at issue.

This Court summed up the public rights in the intertidal flats at the beginning of this century in *Marshall v. Walker*, 93 Me. 532, 45 A. 497 (1900). The public "may sail over them, may moor their craft upon them, may allow their vessels to rest upon the soil when bare, may land and walk upon them, may ride or skate over them when covered with water bearing ice, may fish in the water over them, [and] may dig shell fish in them ...." *Id.* at 536–37, 45 A. at 498.[12]

The last time this Court examined any of the public rights in intertidal lands we adopted an expansive view of the right of navigation. In *Andrews v. King*, 124 Me. 361, 129 A. 298 (1925), the shore owner claimed that the defendant, operator of a small power boat for hire, had no right to land passengers on his flats between high and low water mark. The plaintiff argued that under the express terms of the Ordinance, the right of navigation was limited to the stated purpose of passage to "other men's houses" or navigation for the purposes of fishing and fowling. We rejected this rigid construction of the Ordinance and held that the reservation in the Ordinance encompassed a general right of navigation. More significantly, we noted that the right of navigation included the mooring of vessels, and the discharging and taking in cargoes, provided the flats are unoccupied. *Id.* at 364, 129 A. at 299. *Accord, Deering v. Long Wharf*, 25 Me. 51, 65 (1845). In addition, members of the public were permitted to make such uses of the privately owned flats "[i]n the pursuit of [their] private affairs, of business *as well as pleasure*." *Id.* (emphasis added).

This Court has imposed limitations on the right of the public to use the intertidal flats for certain purposes. Significantly, however, we have not held, nor even suggested, that the scheme of ownership established by the Ordinance precludes the public from using the intertidal zone for common recreational beach activities. In *Moore v. Griffin*, 22 Me. 350 (1843), this Court held that "[n]either the ordinance

nor the common law would authorize the taking of 'muscle-bed (sic) manure' from the land of another person." *Id.* at 356. The plaintiff in *Moore* brought an action in trespass quare clausum against defendant for entry upon his river flats between high and low water mark and removal of six gondola loads of mussel-bed manure. The Court rejected the defendant's contention that the Ordinance reserves not only the rights of fishing and fowling but also permits taking sand, sea manure and ballast, as a right of soil in the flats. Rather, the Court held: "No such practice can be recognized as depriving the legal owner of his rights according to his title, unless supported by proof, that would establish a common right. The language of the reservation in the ordinance cannot be extended beyond the obvious meaning of the words fishing and fowling." *Id.* The decision in *Moore* was approved more than forty years later by this Court in *King v. Young*, 76 Me. 76 (1884).

Similarly, we have prohibited the taking of seaweed from the flats of another. "[T]he title to the seaweed is in the owner of the flats ...." *Hill v. Lord*, 48 Me. 83, 86 (1861). Although we have not decided the question, at least one commentator has suggested that the scheme of ownership established by the ordinance also prohibits the public from taking sand and empty shells from the flats. *See* Comment, *The Public Trust Doctrine in Maine's Submerged Lands: Public Rights, State Obligation and the Role of the Courts*, 37 Me.L.Rev. 105, 114 (1985).

In addition to prohibiting the taking of certain substances from the flats, we have also prohibited the deposit of substances on the flats. For example, in *McFadden v. Haynes and DeWitt Ice Co.*, 86 Me. 319, 29 A. 1068 (1894), this Court held that the defendant ice company, a member of the public, had no right to deposit snow upon the plaintiff's flats between high and low watermark. The defendant argued that since a fisherman had the right to engage in certain activities on the flats such as

---

12. A commentator logically suggests that, given the date of the opinion, the mode of riding contemplated was horseback, ice boat, or sleigh. Waite, at 172.

anchoring his boat there or placing an ice boat or hut on the frozen surface, "an ice-cutter, by analogy, should be allowed temporarily to encumber another's flats with snow scraped from his ice." *Id.* at 324, 29 A. at 1069. We disagreed, however, and took a more restrictive view of the public's right to encumber the flat.

> Property rights can not be established by analogy alone. The fisherman has a right to go upon another's flats to take his fish, because the ordinance of 1647 ... expressly reserved the right of fishery. The fisherman has a right to go upon another's flats because it is one of his reserved rights. But no such right was reserved to the ice-cutter. ... And we fail to perceive how an ice company, operating upon one of our navigable rivers, can possess the right to deposit the snow scraped from its ice upon the flats of an adjoining owner, without the latter's consent. It is not among the reserved rights mentioned in the ordinance of 1647, nor ... has the right to thus incumber another's land been recognized or affirmed by judicial decision. ...

*Id.,* 29 A. at 1069.[13]

In modern times this Court, sitting as the Law Court, has not been called upon to further define and delineate the public right. We have, however, expressed the view that public rights in intertidal lands are dynamic. In *Opinion of the Justices,* 437 A.2d 597 (Me.1981), the question posed to the Justices concerned the constitutionality of a bill releasing the state's interest in filled submerged and intertidal lands. In commenting on the reasonableness of the legislation, the individual Justices recognized that the rights of the public in submerged and intertidal lands must evolve with the passage of time.

> Navigation, fishing, and fowling were the historical purposes for which the public trust principle was developed in the

common law. Those public uses of intertidal and submerged lands remain important, but others have grown up as well. The press of an increasing population has lead to heavy demands upon Maine's great ponds and seacoast for recreation uses.

*Id.* at 607. The Law Court later noted that the Justices had stated that "the needs of a growing society may lead to a wider variety of public uses" of submerged lands. *Harding v. Commissioner,* 510 A.2d 533, 537 (Me.1986).

In 1925, when this Court decided *Andrews,* we expanded the right of navigation and in doing so we noted that plaintiff's flats had been used as a landing place for fifty years. *Andrews v. King,* 124 Me. at 364, 129 A. 298. We rejected a rigid application of the terms of the Ordinance and resorted to contemporary notions of usage and public acceptance in order to strike a rational and fair balance between private ownership and public rights. Similarly, in the present controversy we should consider current notions of usage and public acceptance. Although the practice of fishing, fowling and navigation, as classically defined, may have become less important, other recreational uses have developed and received public acceptance within the past sixty years. I am persuaded that this Court and the Superior Court erred in arresting further development in the law by effectively confining public rights to those that had been recognized prior to 1925. Although we must avoid placing any additional burden upon the shoreowner, there is no reason to confine, nor have we in the past confined, the rights of the public strictly to the usage prevailing in the 17th Century. Neither reason nor logic supports the necessary and unfortunate conclusion flowing from this Court's analysis; namely, that the common law rights of the

---

**13.** We have recognized more extensive public rights in Great Ponds than in tidal flats. In addition to fishing, fowling, boating, skating or riding on the ice, the public may also swim in Great Ponds, *Gratto v. Palangi,* 154 Me. 308, 147 A.2d 455, 458 (1958), and cut ice from them. *Barrett v. Rockport Ice Co.,* 84 Me. 155, 24 A. 802 (1891). The public's right to use Great Ponds,

however, is not entirely analogous to its right to use intertidal flats. The Colonial Ordinance itself prohibited private ownership of Great Ponds whereas it gave title to the intertidal flats to the riparian owners. Consequently the State holds title to the Great Ponds for the benefit of the public. *Id.* at 156, 24 A. 802. *Conant v. Jordan,* 107 Me. 227, 230, 77 A. 938, 939 (1910).

public would be extinguished if fishing, fowling, and navigation were no longer practiced. When the necessities of the 17th Century disappear and the emphasis moves from those historic activities to other uses no more burdensome, the common law rights of the public should remain vital. The citizens of Maine are still in need of sustenance, albeit, in a different form.

The genius of the common law has been its ability to adapt legal doctrine to changing needs and circumstances. As we noted long ago: "The common law would ill deserve its familiar panegyric as the 'perfection of human reason' if it did not expand with the progress of society and develop with new ideas of right and justice." *In re Robinson*, 88 Me. 17, 23, 33 A. 652, 654 (1895). The increased importance of recreational use of the shore is evident. The power of the Maine coast to restore body and mind is well known. The Maine Legislature has specifically recognized that "recreational uses are among the most important to the Maine people today who use intertidal land for relaxation from the pressures of modern life and for enjoyment of nature's beauty." 12 M.R.S.A. § 571 (Supp.1987–1988). Such a public resource is not, and never has been, the subject of exclusive ownership. I firmly believe that it is primarily the intensity of the modern use rather than the nature of the use that provides the impetus for this litigation. Given similar degrees of intensity of use, one would imagine that a shoreowner might prefer the presence of sunbathers, swimmers and strollers over fowlers and fishermen. Further, as has been suggested elsewhere, the narrow view adopted by the Court today results in absurd and easily thwarted distinctions between permissible and impermissible activities:

> [A] narrow view would recognize the right to picnic in a rowboat while resting on the foreshore but brand as a trespass the same activities performed while sitting on a blanket spread on the fore-

shore. The narrow view taken by the Massachusetts court does not exclude the public from walking on the foreshore as it purports; it merely requires that a person desiring to stroll along the foreshores of that state take with him a fishing line or net. In keeping with the apparent purpose of the Colony Ordinance and its past decisions, the Maine Supreme Judicial Court can refuse to draw such a delicate distinction between the rights expressly reserved in the ordinance and similar recreational activities. With such a refusal the court will avoid the anomalous result of "declaring the same man a trespasser for bathing, who was no trespasser when up to his knees or neck in water, in search of a lobster, a crab, or a shrimp."

Comment, *Coastal Recreation* at 83.

In the context of this case, I would not attempt to provide a comprehensive definition of the recreational activities that could fall within the common law rights of the public. The plaintiffs requested a declaration that their ownership was subject only to the rights of fishing, fowling and navigation. The Superior Court granted their request, confining the public rights to those previously recognized by this Court and denying any further judicial development of those rights. I conclude that the court was in error. The rights of the public are, at a minimum, broad enough to include such recreational activities as bathing, sunbathing and walking. As ordinarily practiced, such activities involve no additional burden on the shoreowners and nothing is taken from or deposited on the intertidal lands. The present litigation does not require that we delineate the outer limits of the public rights. On the record before us it is only necessary to rule that the plaintiffs are not entitled to a declaration restricting the public rights to fishing, fowling and navigation. Any further refinement should await common law development or legislative action.[14]

---

**14.** Similarly, since we consider the Public Trust in Intertidal Land Act only to determine whether it precludes the declaratory relief sought by plaintiffs, we have no occasion to pass on the outer limits of that Act. Specifically, I would not rule on the validity of the provision permitting municipalities to authorize use of the shore by motorized vehicles. *See* 12 M.R.S.A. § 573(2)(D).

*Constitutionality of the Public Trust in Intertidal Land Act*

On April 25, 1986 the Maine Legislature enacted the Public Trust in Intertidal Land Act, P.L. 1985, ch. 782. That Act, subsequently codified as 12 M.R.S.A. § 571–573 (Supp.1987–1988), provides that the intertidal lands are the subject of a public trust, that the State is the trustee of public rights in the intertidal lands, and that public rights include recreation as well as fishing, fowling, and navigation. The legislation reads in its entirety as follows:

§ 571. Legislative findings and purpose

The Legislature finds and declares that the intertidal lands of the State are impressed with a public trust and that the State is responsible for protection of the public's interest in this land.

The Legislature further finds and declares that this public trust is part of the common law of Maine and generally derived from the practices, conditions and needs in Maine, from English Common Law and from the Massachusetts Colonial Ordinance of 1641–47. The public trust is an evolving doctrine reflective of the customs, traditions, heritage and habits of the Maine people. In Maine, the doctrine has diverged from the laws of England and Massachusetts. The public trust encompasses those uses of intertidal land essential to the health and welfare of the Maine people, which uses include, but are not limited to, fishing, fowling, navigation, use as a footway between points along the shore and use for recreational purposes. These recreational uses are among the most important to the Maine people today who use intertidal land for relaxation from the pressures of modern society and for enjoyment of nature's beauty.

The Legislature further finds and declares that the protection of the public uses referred to in this chapter is of great public interest and grave concern to the State.

§ 572. Definitions

As used in this chapter, the term "intertidal land" means all land of this State affected by the tides between the mean high watermark and either 100 rods seaward from the high watermark or the mean low watermark, whichever is closer to the mean high watermark.

§ 573. Public trust rights in intertidal land

1. Public trust rights. The public trust rights in intertidal land include the following:

A. The right to use intertidal land for fishing, fowling and navigation;

B. The right to use intertidal land for recreation; and

C. Any other trust rights to use intertidal land recognized by the Maine common law and not specifically abrogated by statute.

2. Limitations. The rights described in subsection 1 do not include:

A. The removal from the intertidal land of any sand, soil, rocks or other minerals;

B. Interference with any structure, development or improvement erected or maintained on intertidal land in accordance with the laws of this State;

C. The depositing of any refuse or waste on intertidal land or in the water covering intertidal land; or

D. Use or operation of motorized vehicles other than navigable watercraft, unless specifically authorized by state law or municipal ordinance.

3. Police Powers. Municipalities shall have jurisdiction to exercise their police powers to control public use of intertidal land, except where such exercise is superseded by any state law.

4. Other public rights. This chapter does not affect public rights in intertidal land arising from custom, prescription, implied dedication, acquiescence or any other source. This chapter does not affect public rights in dry sand areas upland from intertidal land arising from custom, prescription, implied dedication, acquiescence, the public trust doctrine or any other source.

The Superior Court held that the Public Trust in Intertidal Land Act violates the separation of powers provision of the Maine Constitution. Without addressing

the Superior Court's ruling, this Court now holds that the Act is unconstitutional because it constitutes a taking of private property. Because, in my view, the public common law rights in the intertidal lands includes recreational uses, the Act merely declares the common law [15] and there is no taking of property. The statute, however, does contain provisions that may constitute an addition to existing common law, i.e., provisions declaring that intertidal lands are the subject of a public trust and that the State is trustee of those public rights. Accordingly, my analysis requires a review of the Superior Court's holding that the Act violated the separation of powers provision of the Maine Constitution.

The Superior Court acknowledged the authority of the Legislature to "codify, alter, or abrogate" the common law but maintained that it must do so by making new law rather than by interpreting existing law. Construing our opinion in *Bell v. Wells I* as holding that the State is not a trustee of the public rights, the court found that the contrary legislative interpretation encroached upon the authority of the judiciary. Under the Maine Constitution, governmental powers are "divided into three distinct departments, the legislative, executive and judicial." Me. Const. art. III, § 1. The separation of powers provision provides that "[n]o person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others." *Id.* § 2. Because the rule of separation of powers is explicit in the Maine Constitution, the principle is more strictly construed than in the federal system where the rule is only im-

plicit. *State v. Hunter*, 447 A.2d 797, 799 (Me.1982). The inquiry is whether the particular power has been "explicitly granted to one branch of state government, and to no other branch. If so, article III, section 2 forbids another branch to exercise that power." *Id.* at 800. As we have explained, the question is similar to the one posed by the federal courts in evaluating whether an issue is a non-justiciable political question —namely, "whether there is a 'textually demonstrable constitutional commitment' of the issue to another branch of the government." *Id.* n. 4 (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962)).

Although the Maine Constitution does not define the parameters of the judicial power, the opinions of this Court provide guidance. The essence of the judicial power, as distinguished from the legislative, is its focus on resolving specific controversies between particular parties in litigation. In *Lewis v. Webb*, 3 Me. 326 (1825), we held that a legislative resolve granting to a particular litigant the right to appeal a decree of the probate court was an improper exercise of the judicial power by the Legislature. "It is one of the striking and peculiar features of judicial power that it is displayed in the decision of controversies between contending parties; the settlement of their rights and redress of their wrongs." *Id.* at 332.[16] By contrast, a proper exercise of legislative power "must in its nature be general and prospective; a rule for all, and binding on all. It is the province of the legislature to make and establish laws; and it is the province and

---

**15.** In enacting the Public Trust in Intertidal Lands Act, the Legislature sought to regulate, preserve and protect judicially-created public rights rather than to create expanded public rights by legislation. The statute was originally proposed in draft form merely as a means "to encourage the courts to facilitate claims of public recreation easements in the seashore." Comment, *Coastal Recreation* at 102.

**16.** In *State v. LeClair*, the Law Court again emphasized that the judicial power is exercised in the context of private dispute resolution.

> [J]udicial power, is ... employed to designate that department of government which it was intented (sic) should, interpret and adminis-

ter the laws and decide private disputes between or concerning persons. By the, judicial power, of courts is generally understood, the power to hear and determine controversies between adverse parties and questions in litigation. It is the, inherent authority, not only to decide but to make binding orders or judgments, which constitutes judicial power; and the instrumentalities used to inform the tribunal, whether left to its own choice or fixed by law, are merely auxiliary to that power and operate on the persons or things only through its action and by virtue of it.

*State v. LeClair*, 86 Me. 522, 531, 30 A. 7, 9 (1894) (quotations omitted).

duty of judges to expound and apply them." *Id.* at 333. Because the Legislature in *Lewis* had conferred upon an individual litigant a right particular to him alone, it had encroached upon the judicial power.

In evaluating whether the Legislature encroached upon the judicial power when it enacted the Public Trust in Intertidal Land Act, I note first that legislative enactments must be presumed constitutional. *Ace Tire Co. v. Municipal Officers of Waterville*, 302 A.2d 90, 95 (Me.1973). The Superior Court held that the Legislature violated the separation of powers provision because it had purported to interpret the common law, rather than make new law. I conclude that the Legislature acted to declare the existence of a public trust in the intertidal lands, regardless of whether that trust existed at common law. The legislative findings and purpose, 12 M.R.S.A. § 571, include three independent findings only one of which refers to the common law. Significantly, in the first paragraph of section 571, the "Legislature finds and declares" the public trust in the intertidal lands and that the "State is responsible" for protecting "the public's interest." *Id.* In the second paragraph of section 571, the "Legislature *further finds* and declares that the public trust is part of the common law." In the final paragraph, the "Legislature *further finds* that the protection of public uses … is of great public interest and grave concern."

Even if we assume that the Legislature has purported to interpret the common law, it has not encroached upon the essence of the judicial function which is, as noted above, the resolution of disputes between particular litigants. Undoubtedly, the Legislature acted partly in response to the present litigation. The Act, however, provides a rule of general applicability designed to aid in the resolution of all potential disputes regarding the scope of the public's rights in the entire coast of Maine. The Act provides a rule "for all, and binding on all," not simply a rule for the parties to this litigation. *Lewis v. Webb*, 3 Me. 326, 333 (1825). The Act is therefore within the scote of Legislature's authority to alter, abrogate, and codify the common law. *See e.g., Atlantic Oceanic Kampgrounds v. Camden National Bank*, 473 A.2d 884, 886 (Me.1984). I would find no violation of the separation of powers provision of the Maine Constitution.

### Conclusion

Twice in its opinion this Court mentions the finding of the Superior Court concerning the public's habit of "strolling" up and down the length of Moody Beach and the acquiescence of the private owners. Despite the shoreowners' testimony that they would continue to permit this activity in the future, they are not bound to do so, and the Superior Court order, affirmed by this Court, does not acknowledge any right on the part of the public to stroll on the beach. This Court's opinion does nothing to dispel the obvious conclusion that from this moment on, at Moody Beach and every other private shore in Maine, the public's right even to stroll upon the intertidal lands hangs by the slender thread of the shoreowners' consent. I will not hazard a guess whether that consent will be forthcoming. In my judgment, the public rights should not be so quickly and completely extinguished. I admit that the Court has assiduously followed the path taken by the courts of Massachusetts but, for me, that is not the goal. By interpreting Maine history, without attempting to revise it, I find a legally sufficient basis for recognizing limited public recreational rights in the Maine seashore. I am strengthened in my conviction by the fact that those same rights have been recognized by the Maine Legislature. I would vacate the judgment.